CYPRUS AMAX MINERALS
COMPANY, Petitioner,

v.

LEXINGTON INSURANCE COMPANY;
Zurich Specialities London Limited;
and Gerling–Konzern Allgemeine Versi-
cherungs–AG, Respondents.

No. 02SC247.

Supreme Court of Colorado,
En Banc.

June 16, 2003.

Rehearing Denied Aug. 18, 2003.

Fognani Guiboard Homsy & Roberts, LLP, John D. Fognani, R. Kirk Mueller, Denver, Colorado, Attorneys for Petitioner.

White and Steele, P.C., Franz Hardy, Frederick W. Klann, Denver, Colorado, Attorneys for Respondent.

Roberts Levin & Patterson, P.C., Bradley A. Levin, Christine K. Wilkinson, Michael J. Rosenberg, Denver, Colorado, Amicus Curiae for the Trial Lawyers Association.

Campbell, Latiolais & Ruebel, P.C., Brian E. Martin, Jeffrey Clay Ruebel, Denver, Colorado, Amicus Curiae for Colorado Defense Lawyer's Association.

Justice KOURLIS delivered the Opinion of the Court.

## I. Introduction

This is a case in which an insured is seeking indemnification from its insurers. The

insured, Cyprus Amax Minerals Company ("Cyprus"), sold the Golden Cross Mine to Coeur d'Alene Mines Corporation ("Coeur"). Two years after the sale, the Mine experienced substantial damage, eventually leading to its close, stemming from a landslide deep below ground. After years of litigation, Cyprus and Coeur settled their claims and Cyprus sought indemnification from its insurers. The insurers refused, and Cyprus sued. The trial court granted summary judgment in favor of the insurers and the court of appeals affirmed. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 55 P.3d 200 (Colo. App.2002). We granted certiorari on three issues, relating both generally and specifically to the insurers' indemnification obligation.[1]

We now hold as follows. First, we explore the difference between an insurer's duty to defend its insured and an insurer's duty to indemnify its insured. We note that the rule directing a trial court to examine the underlying complaint in order to determine whether the insurer has a duty to defend its insured against the claims asserted is a rule designed to cast a broad net in favor of coverage. To interpret that rule in a way that narrows coverage when applied to a duty to indemnify would be inconsistent with our precedent. Accordingly, we hold that in determining the possibility of indemnity coverage, the trial court must examine the nature of the facts alleged and claims pled in the complaint or amended complaint liberally with a view toward affording the greatest possible protection to the insured. If, when read liberally, such document can colorably support a conclusion that coverage may attach, then the court may consider such additional evidence as will buttress or defeat coverage. Second, we hold that "property damage" was at issue in the lawsuit between Coeur and Cyprus, because "property damage" under the language of these policies can include the costs of repairing the Mine and the costs incurred by Coeur in loss of use of the Mine after the landslide. Third, we hold that the landslide was a "loss" or "accident" that could trigger the possibility of coverage under the terms of these policies and that no further causal connection was required by the policies.

We therefore conclude that there are genuine issues of material fact in dispute. Accordingly, we overturn the entry of summary judgment and remand this case for resolution of the factual issue of whether some portion of the settlement amount is compensable property damage attributable to physical injury to or destruction of the Mine including the loss of use of the Mine arising out of the landslide.

## II. Facts and Procedural History

In April of 1993, Cyprus sold the Golden Cross Mine in Auckland, New Zealand to Coeur through a stock purchase agreement for nearly $54 million. Coeur operated the Mine successfully for almost two years, until the Mine experienced significant damage as a result of deep-seated ground movement. Coeur made efforts to repair the damage caused by the subsidence at the Mine, but eventually closed the Mine.

In 1996, litigation ensued between the parties, centering on the damaged Mine. Cyprus initiated suit by filing a declaratory judgment

---

1. Specifically, we granted certiorari on the following three issues:

 1) Whether the court of appeals erred in determining the Respondent insurance companies' ("Insurers") duty to *indemnify* Cyprus by applying a *duty to defend* analysis, i.e. restricting its review of the underlying case to the four corners of the complaint and ignoring other evidence of what was at issue in the underlying litigation and settlement.

 2) Whether the court of appeals erred in holding that damages sought by Coeur d'Alene Mining Company ("Coeur"), based on allegations that negligent misrepresentations by Cyprus led it to purchase mining property that was subsequently damaged by a landslide causing Coeur to incur remediation costs, were purely "economic" losses and not "property damage" as defined in the subject insurance policies.

 3) Whether the court of appeals erred in effectively holding that, even if there was a sufficient "casual connection" for Cyprus to have been held *liable* for the costs of repairing property damaged by a landslide due to its alleged negligent misrepresentation, there was not a sufficient "causal connection" to bring such liability within the coverage provided by the subject insurance policies.

action against Coeur in Federal District Court in Colorado. Shortly thereafter, Coeur filed an action in its home state of Idaho (the "underlying litigation").[2] In its Second Amended Complaint, Coeur alleged that Cyprus negligently, recklessly, or deliberately failed to disclose material facts regarding conditions at the Mine, which ultimately resulted in the subsidence. Coeur brought claims under the Idaho and Colorado Securities Acts, common law fraud, and common law rescission. Three years into litigation, the underlying litigation settled for approximately $31 million.

Cyprus maintained excess liability insurance policies through Lexington Insurance Company, Zurich Specialities London Limited, and Gerling–Konzern Allgemeine Versicherungs–AG ("Insurers"). Each policy provided in pertinent part that the Insurers would indemnify the Insured for a loss (defined as an accident, including continuous or repeated exposure to the same general harmful conditions) imposed upon the Insured by law or assumed by contract for damages on account of personal injury, property damage or advertising injury. "Property damage" is defined as physical injury to or destruction of tangible property, including the loss of use thereof.

After Cyprus and Coeur settled the underlying suit, Cyprus then sought indemnification for the amount of the settlement. The Insurers denied the claim and refused to indemnify Cyprus, claiming that Cyprus' liability in the underlying suit was not covered by the policies.

Cyprus subsequently commenced a civil action against the Insurers in Denver District Court claiming breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair trade acts and practices. The Insurers filed a motion for summary judgment, arguing that Cyprus' claim was not covered because the underlying litigation did not include "property damage," for which the Insurers would be liable. Rather, the Insurers contended that the claims were based entirely on fraud and oth-

er intentional acts by Cyprus and involved only economic damages, not property damage as would be covered by the policies. The district court granted summary judgment in favor of the Insurers, disagreeing with the Insurers' argument that the claims were based on intentional acts, but agreeing that Coeur did not allege property damage in the Second Amended Complaint. Additionally, the district court found that no material issue of fact was in dispute and that the "loss" suffered by Coeur focused solely on monetary damages not covered by the policies.

The court of appeals affirmed the judgment of the district court, concluding that the Second Amended Complaint did not allege property damage, but rather only economic damages resulting from fraud and misrepresentation. The court determined that because the duty to defend is broader than the duty to indemnify and because Insurers' obligation to defend arises from the four corners of the complaint, there can be no duty to indemnify where the complaint does not allege facts that would impose liability. Finally, the court also noted that irrespective of Coeur's descriptions in the Second Amended Complaint of the property damage at the Mine, no causal connection existed between any alleged misrepresentations and the property damage.

### III. Standard of Review

As a starting point for this analysis, it is important to remember that, "summary judgment is a drastic remedy and should only be granted if there is a clear showing that no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law." *AviComm, Inc. v. Colo. Pub. Utils. Comm'n*, 955 P.2d 1023, 1029 (Colo.1998); *see also Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo.1999). Courts grant the nonmoving party all favorable inferences that may be drawn from uncontested facts, and resolve any doubt as to whether a triable issue of material fact exists against the moving party. *See Compass*, 984 P.2d at 613. This court

**2.** Ultimately, only the Idaho suit proceeded and the Second Amended Complaint in that case

forms the basis of argument in the case at hand.

reviews grants of summary judgment de novo.

## IV. Principles of Insurance Contract Interpretation

 An insurance policy is merely a contract that courts should interpret in line with well-settled principles of contract interpretation. *See Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo.1999); *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo.1990). In undertaking the interpretation of an insurance contract, courts should be wary of rewriting provisions, and should give the words contained in the contract their plain and ordinary meaning, unless contrary intent is evidenced in the policy. *Chacon*, 788 P.2d at 750. Courts should read the provisions of the policy as a whole, rather than reading them in isolation. *Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236, 239 (Colo.1992). Courts may neither add provisions to extend coverage beyond that contracted for, nor delete them to limit coverage. However, because of the unique nature of insurance contracts and the relationship between the insurer and insured, courts do construe ambiguous provisions against the insurer and in favor of providing coverage to the insured. *Chacon*, 788 P.2d at 750. A court's interpretation of an insurance contract is a matter of law, subject to de novo review. *Compass*, 984 P.2d at 613.

## V. Duty to Indemnify

We must begin by deciding what a court may review in resolving whether an insured is entitled to indemnification of its loss. The trial court and the court of appeals began by looking to the underlying complaint itself and concluded that the Insurers had no obligation to indemnify Cyprus for liability stemming from the negotiated settlement with Coeur because the Second Amended Complaint contained no claim for covered losses. We agree that the Complaint serves as the starting point for the analysis of whether the loss is covered, but we disagree that it is the end point as well. To hold otherwise would belie the underlying purpose of the complaint rule as it has developed in the context of the duty to defend: namely, to require an insurer to provide its insured with a defense if the facts or claims alleged may arguably fall within the policy. When applying this rule in the context of a duty to indemnify, it must similarly be used to cast a broad net.

 Initially, we must revisit the distinction between an insurance company's duty to defend its insured, and its duty to indemnify. The duty to defend concerns an "insurance company's duty to affirmatively defend its insured against pending claims." *Constitution Assoc. v. N.H. Ins. Co.*, 930 P.2d 556, 563 (Colo.1996). We have long held that to determine whether a duty to defend exists, courts must look no further than the four corners of the underlying complaint (the "four corners" or "complaint" rule). *See Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1089 (Colo.1991). An insurer is not excused from this duty "unless there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured." *Id.* at 1090. Hence, if the alleged facts even potentially trigger coverage under the policy, the insurer is bound to provide a defense. *Constitution Assoc.*, 930 P.2d at 563; *Hecla*, 811 P.2d at 1089.

 The duty to defend is separate and distinct from an insurer's obligation to indemnify its insured. *Hecla*, 811 P.2d at 1086 n. 5; 14 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3D § 200:3 (1999). The duty to indemnify relates to the insurer's duty to satisfy a judgment entered against the insured. *Constitution Assoc.*, 930 P.2d at 563. Because the duty to defend encompasses any potential claims raised by the facts and the duty to indemnify relates to the actual liability imposed, this court has considered the duty to defend to be a broader concept than the duty to indemnify. *Id.; Hecla*, 811 P.2d at 1089.

Since we have held that the duty to defend is broader than the duty to indemnify and have also held that the determination of whether an insurer has a duty to defend lies within the four corners of the complaint, the court of appeals here held that courts must also rely on the four corners of the underlying complaint to determine whether the insurer has an obligation to indemnify. *Cy-*

*prus Amax Minerals Co. v. Lexington Ins. Co.,* 55 P.3d 200, 206 (Colo.App.2002). Relying on the principle that where no duty to defend exists, there can be no duty to indemnify, the court held that where the complaint contains no allegations that could create a duty to defend, then there is similarly no duty to indemnify. *Id.* Although we agree that the complaint must implicate coverage before any duty can be at issue, we do not agree with the court of appeals' narrow application of the principle in this case.

In *Hecla,* this court analyzed whether a duty to defend and a duty to indemnify existed in a general liability insurance policy covering Hecla. 811 P.2d at 1085–86. Prior to the resolution of the underlying claim, Hecla requested a defense from its insurers and the insurers sought a judicial determination as to whether it owed the duty to defend and the duty to indemnify. *Id.* at 1086. *Hecla* set forth the common principles regarding the duty to defend, as discussed above, and concluded that the trial court did not err in determining that the insurers owed a duty to defend. *Id.* at 1086, 1089. Because the issue of whether the insurers faced an obligation to indemnify could only be decided after Hecla's liability had been determined, the court concluded that the issue of indemnification was not ripe for resolution. *Id.* at 1086.

Several years later, this court again dealt with the duty to defend issue in an anticipatory declaratory relief action. The court, in *Constitution Associates,* confronted a situation in which an insurance company sought to determine its obligation to indemnify its insured before the underlying lawsuit, which framed the basis of the claims, was concluded. 930 P.2d at 558. The court did hold that an anticipatory declaratory judgment action can be appropriate in some instances, and in that context discussed the interplay between the duty to defend and duty to indemnify doctrines. *Id.* at 563–64. We confirmed the principles articulated in *Hecla,* noting that the duty to defend arises where the claims even potentially fall within the policy's coverage, but the duty to indemnify is only triggered where the policy actually covers the alleged harm. *Id.* at 563. We reiterated that where no duty to defend exists, it fol-lows that there can be no duty to indemnify. *Id.*

Finally, in *Compass Insurance Co. v. City of Littleton,* 984 P.2d 606, 609 (Colo.1999), the city initiated a declaratory judgment action to determine whether its insurance policies obligated its insurers to cover liability arising out of sewage sludge dumping. We again noted that the duty to defend sweeps more broadly than the duty to indemnify, reaffirming that where a duty to defend exists, a duty to indemnify may follow, but also recognizing that if the duty to defend does not first exist, the duty to indemnify cannot follow. *Id.* at 613, 621. The court noted that,

It is true that a resolution of the duty to indemnify is premature where there is a duty to defend but the liability of the insured has not yet been determined. However, once an insurer has prevailed on the duty to defend, the issue of the duty to indemnity is ripe for resolution because "[w]here there is no duty to defend, it follows that there can be no duty to indemnify."

*Id.* at 621 (internal citations omitted). The court found, as a matter of law, that the insurers could not be excused from their duty to defend given the nature of the claims, therefore, the duty to indemnify issue was not yet ripe. *Id.*

All of these cases dealt with scenarios where both a duty to defend and a duty to indemnify were at issue. To the contrary, the policy here contains no duty to defend, under any circumstance. The policy provides only indemnification.

None of the parties is arguing that because there is no contractual duty to defend, there is no duty to indemnify. That would defeat the purpose of the policy altogether. In fact, the parties have explicitly contracted for the separate and distinct consideration of a duty to indemnify. What the Insurers do argue is that there is no basis for any duty to defend the lawsuit brought by Coeur against Cyprus, and thus no corresponding obligation to indemnify Cyprus for the loss. Hence, we must now determine how to evaluate the obligation to indemnify, cut loose from any obligation to defend.

■ The duty to indemnify arises only when the policy actually covers the harm and typically cannot be determined until the resolution of the underlying claims. *See Hecla,* 811 P.2d at 1086 (concluding that the issue of indemnification was not ripe for resolution until the liability was actually determined); *Employers' Fire Ins. Co. v. W. Guar. Fund Svcs.,* 924 P.2d 1107, 1110 (Colo.App.1996) ("While the duty to indemnify can only be determined after the development of a full factual record, the duty to defend must be determined based solely on a comparison of the allegations of the complaint made against the insured with the insuring provision of the policy."); *see also* 14 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3D §§ 200:1, 200:3 ("whether an insurer has a duty to defend is based on the existence of coverage under the policy, but actual coverage is not ascertainable until after the underlying case is litigated").

Further, we have held that the determination of whether coverage is ultimately required is a question of fact. *See Hecla,* 811 P.2d at 1089. Our consistent recognition that the trigger for the duty to indemnify must normally await a determination of actual liability presupposes that indemnity flows from the nature of the ultimate verdict, judgment or settlement.

■ In the duty to defend context, the "complaint rule" operates to cast a broad net, such that when the underlying complaint alleges *any facts* or claims that might fall within the ambit of the policy, the insurer must tender a defense. *See id.; Compass,* 984 P.2d at 613–14. An insurer has a heavy burden to overcome in avoiding the duty to defend, such that "the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot." *Compass,* 984 P.2d at 614 (quoting *Standun, Inc. v. Fireman's Fund Ins. Co.,* 62 Cal.App.4th 882, 73 Cal.Rptr.2d 116, 120 (1998)).

■ Applying that principle in a straight duty to indemnify context in such a way as to limit or constrain coverage belies its purpose.

Certainly, a trial court should look to the operative complaint as an important factor in resolving indemnity disputes, as such claims may have been amended to conform to the evidence.[3] *See* C.R.C.P. 15(b) (allowing parties to amend complaints to conform to the evidence presented at trial); Idaho R. Civ. P. 15(b) (same). However, the nature of the claims pled, the relief sought and the facts alleged must be construed broadly; and the failure to identify a particular claim for relief, while simultaneously alleging facts that would support such a claim, cannot be dispositive.

■ When the facts pled, claims asserted and relief sought do arguably include a loss for which an insured would potentially be liable, that cannot be the end of the inquiry. Rather, at that point, the court must look to the facts as they developed at trial and the ultimate judgment. The jury's verdict form may break out specific claims and the verdict attributable to those claims. If there are various claims and the verdict does not separate them, the trial court making the indemnity determination may have to look at the facts presented at trial. In short, certainly no verdict can enter on a claim not pled and proven, but the complaint, as amended, is but the starting point in that analysis.

■ Where the claims do not proceed through the crucible of trial, and instead are settled by the parties, the analysis becomes more difficult. Again, the first step must be the final version of the complaint, for if no colorable claim is made that would invoke indemnification coverage, then the presumption is that no such coverage exists. However, notice pleading does not contemplate detail and specificity, and certainly, a trial court could review other matters in arriving at a conclusion as to whether some portion or all of the settlement would be properly subject to indemnification.

■ The determination of whether a duty to indemnify exists requires factual development, as it is largely a question of fact. Extrinsic evidence may assist the trial court

---

3. We decline to comment as to the effect of such an amendment on an anticipatory declaratory action where a court finds no duty to defend and consequently no duty to indemnify.

in determining whether and to what extent actual liability, as represented by a verdict or settlement, is covered by an existing policy.

## VI. Analyzing Coverage Under These Policies

Thus, we now return to the facts of this case in order to answer the question of whether the Insurers have any responsibility to indemnify Cyprus for the Coeur lawsuit settlement. We first set out the language of the policies to establish the framework for applicable coverage, then we summarize portions of the Second Amended Complaint in order to identify Coeur's claims. Because we view the facts as alleged in the Second Amended Complaint as raising a colorable claim of coverage, we also review the extrinsic evidence. Lastly, we determine, in light of applicable principles of law, what "property damage" means under the policies, and whether there is a causal connection required by the policies other than that the damages were occasioned by the landslide.

### A. The Policy

 The insurance policies require the Insurers to pay for Cyprus' liability for damages on account of property damage resulting from a loss. Specifically, the policies state in pertinent part:[4]

In the event that a claim or claims are first made, in writing, against the Insured during the period of this Policy arising from a Loss which took place on or after 1st April, 1991 (hereinafter referred to as the Retroactive Date), Underwriters will indemnify the Insured, subject to the Limits of Liability set forth in the Declarations and the applicable provisions of this Policy, for that amount of the ULTIMATE NET SUM PAYABLE in excess of the UNDERLYING AMOUNTS OBLIGATIONS OF THE INSURED which the Insured shall be obligated to pay by reason of the liability:

 (a) imposed upon the Insured by law, or

 (b) assumed by the Insured under contract or agreement,

for damages on account of:—

 (i) Personal Injuries,

 (ii) Property Damage,

 (iii) Advertising Injury,

resulting from each Loss, but only such Personal Injuries, Property Damage and Advertising Injury, neither expected nor intended by the Insured, as respects the claim or claims that are first made, in writing, against the Insured during the period of this Policy.

. . .

The words "PROPERTY DAMAGE", wherever used in this Policy, mean:—

 (a) physical injury to or destruction of tangible property, including the loss of use thereof resulting therefrom;

 (b) loss of use of tangible property which has not been physically injured or destroyed.

. . .

The word "LOSS", wherever used in this Policy, means an accident, including continuous or repeated exposure to the same general harmful conditions. . . .

### B. Coeur's Allegations

We look next to the allegations contained in the Second Amended Complaint to see if there is a colorable articulation of facts that could lead to a finding of liability under the policies.

While not specifically citing a cause of action for "property damage," we do find instances in the Second Amended Complaint where Coeur alleged facts that could lead to a recovery for "property damage." Specifically, Coeur alleged in the Second Amended Complaint:

In late 1995, the plaintiffs learned that portions of the slope at the Mine site upon which the Union tailings impoundment is situated were sustaining movement approximately 60 meters under the surface. This movement potentially affected the tailings impoundment. . . .

As a result of the ground movement, it has been, and will be, necessary to *expend*

---

4. We quote from the Lexington policy; however, each of the policies contains substantially similar

*substantial sums of money to attempt to remedy the problem and to protect the integrity of the tailings impoundment and to close the Mine.*

Second Am. Compl. ¶¶ 33–34 (emphasis added). Further, in Coeur's prayer for relief, it sought the following damages:

If at law, for return to plaintiffs from defendant Cyprus of $54,023,460, the true amount of the purchase monies paid by plaintiffs to close the transaction, together with pre-judgment and post-judgment interest thereon, as may be provided by law, *together with judgment for* costs and *expenses plaintiffs incur as a result of Cyprus' misrepresentations and omission, together with interest thereon, as provided by law.*

If in equity, for the decree of this Court ordering rescission of the transaction described in Paragraph 17 of the foregoing complaint, together *with such further orders, judgment, or decrees as may be found by the Court to be meet, proper, or necessary, given all of the circumstances, equitably to restore defendant Cyprus and plaintiffs to the positions they would have occupied had the transaction not occurred.*

Second Am. Compl. ¶¶ 1–2 (emphasis added).

The Complaint also contains factual allegations that Coeur expended substantial sums of money in an effort to stabilize and repair the Mine and that Coeur incurred losses attributable to the loss of use of the Mine after Coeur was forced to close it. To "restore defendant Cyprus and plaintiffs to the positions they would have occupied had the transaction not occurred," Coeur would have to be reimbursed for those monies.

Thus, we conclude that the Second Amended Complaint does support a colorable claim for property damage, and we thus look to the additional evidence tendered by both parties. Without resolving the factual question, we do determine that the extrinsic evidence buttresses the conclusion that some portion of the settlement amount was attributable to property damage covered by the policies.

First, and most telling, is Coeur's settlement demand letter issued to Cyprus. In that letter, among other things, Coeur's counsel sought approximately $25 million dollars for stabilization and interest.[5] This approximation was based on invoices submitted to Cyprus documenting the amounts expended to repair and stabilize the tailings impoundment and related facilities. Irrespective of how narrowly or broadly we interpret the complaint to include "property damage," the demand letter clearly calls for reimbursement for those expenses associated with Coeur's tangible property damage.

Insurers point to a brief submitted to the trial court, in which Coeur stated that it did not seek personal injury or property damage in the Second Amended Complaint. The statements read as follows:

Cyprus has not set forth any basis for liability the engineering firm it hired has to Coeur for misrepresentations or omissions of Cyprus. Coeur could not sue the engineering firm for tort *since no personal*

language.

**5.** The demand letter contained the following outline of damages:

| | |
|---|---|
| Purchase Price Paid to Cyprus | $ 54,023,460.00 |
| Interest on Purchase Price @ 12% (Idaho Legal Interest) – Six Years | 38,896,891.20 |
| Coeur's Payments For Stabilization (Through 1998 Only) | 21,623,765.34 |
| Interest on Coeur's Payments For Stabilization @ 12% – Three Years | 3,910,277.76 |
| Attorneys' Fees and Taxable Costs For This Case | 3,000,000.00 |
| **Total:** | **$ 121,554,394.30** |

*injury or property damage is alleged in the Second Amended Complaint. ... Coeur alleges injury to the value of the stock (and various elements of associated damage), and not injury to its "property".*

Coeur's Opp'n to Cyprus' Mot. to Vacate Trial at 19. In an attempt to minimize the effect of Coeur's statements, Cyprus notes that Coeur limited its statements by adding: "and various elements of associated damage." With this phrase, Cyprus contends that Coeur included the $21 million sought in stabilization costs, and regardless of Coeur's characterization of those monies, they meet the definition of "property damage" provided for by the policies.[6]

We view the evidence as supporting the conclusion that there is a material question of fact as to whether Coeur was seeking property damage for which Cyprus was entitled to indemnification under the policies.

### C. Analysis

We must now read the factual and legal allegations of the Second Amended Complaint and the extrinsic evidence in the context of the language of the policy.

The Insurers make two primary arguments against coverage. First, they argue that Coeur is really asserting claims only for economic loss, and not for property damage. Second, they argue that that the policies require a causal connection between the alleged misrepresentations by Cyprus and the ultimate subsidence, and there is no such connection.

### i. Property Damage

■ The Insurers claim that the term "property damage" is a limited concept, which on its face, excludes economic loss damages. In considering this argument, we note preliminarily that the policies make no attempt affirmatively to exclude economic losses or economic damages, and to the contrary, do include damages associated with loss of use of property, which might normally be classified as economic damages.

We also note that the term "property damage" is not, in and of itself, a term that carries legal connotation. For example, in Black's Law Dictionary, various kinds of damages are defined, including actual, compensatory, consequential, direct, general, land, proximate and special. Black's Law Dictionary 393–97 (7th ed.1999). "Property" damage is not included.

This court has struggled with differentiating between damages that flow from a breach of contract action and a tort action, focusing in that context on the economic loss rule. *See Town of Alma v. Azco Constr., Inc.,* 10 P.3d 1256, 1264 (Colo.2000) (finding that the crucial difference between tort and contract damages lies in the source of the duties of the parties and that a party suffering from only economic loss stemming from a breach of contract may not assert a claim in tort unless that party is owed an independent duty under tort law); *Vanderbeek v. Vernon Corp.,* 50 P.3d 866, 870–71 (Colo.2002) (reaffirming principles of *Town of Alma,* holding that "where the duty breached stems from a contract, redress must be under the contract," but "where a duty arises independently of any contractual obligations between the parties, a tort action will lie"); *Giampapa v. Am. Family Mut. Ins. Co.,* 64 P.3d 230, 240 (Colo.2003) (allowing non-economic damages in a insurance contract claim when the insurer willfully and wantonly breaches the contract, as long as the damages are foreseeable at the time of contracting and the damages are a natural and probable result of that breach).

However, there is no argument here that the policy covers only torts and not contract actions or that the damages are confined by that distinction. Rather, the argument is that property damage is a stand-alone term, implicitly understood to exclude the kinds of damages normally flowing from contract causes of action, such as depreciation in the value of stock or other financial loss.

The court of appeals compared this case to *Safeco Ins. Co. v. Andrews,* 915 F.2d 500 (9th

---

**6.** Furthermore, counsel appear to be drawing a distinction that relates to privity, and the difference between a tort action and a contract action.

Those distinctions are not applicable to the parsing of Coeur's claims against Cyprus.

Cir.1990). In *Safeco*, a purchaser of real property brought claims against the insured/seller of negligent failure to inspect property and inform buyer of defects, misrepresentation, breach of contract, and rescission of contract. *Id.* at 501. The complaint focused on the seller's alleged failure to discover and properly inform the buyer of facts materially affecting the *value* or *desirability* of the property. *Id.* Safeco claimed that that it owed no duty to defend its insured, as the lawsuit both failed to allege any "property damage" within the meaning established by the policy and to allege an "occurrence" within the meaning of the policy. *Id.* The policy in that case provided coverage "[i]f a claim is made or suit is brought against any insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies" and excluded coverage "under any ... contract or agreement except those directly relating to the maintenance or use of the insured location." *Id.* at 502.

The Ninth Circuit noted first that the coverage clearly did not extend to claims for breach of contract or rescission. *Id.* Next, the court concluded that the purchaser's claims did not expose the insured to liability for damages to tangible property, but rather for economic loss resulting from the failure to discover and disclose facts relevant to the property's value and desirability, because while the defective condition of the property served as an element of the claims alleged, it was not the gravamen of the cause of action against the seller. *Id.* Rather, the court concluded that the damages were caused by the misrepresentations, which the court could not construe as an "occurrence" or a "peril insured against" under the terms of the policy. *Id.; see also State Farm Fire & Cas. Co. v. Brewer*, 914 F.Supp. 140, 143 (S.D.Miss. 1996) (holding that claims of negligent and intentional misrepresentation and fraud are pecuniary in their nature, thus finding that preexisting termite damage was not property damage).[7]

The policies at issue in this case made no attempt to carve out an exclusion for breach of contract or rescission actions, unlike the policy in *Safeco*. Further, in both *M.L. Foss* and in *Safeco*, the parties sought damages related solely to the difference·in the actual value versus the represented value, rather than including any additional damages for remediation costs. Other jurisdictions have considered remediation costs to constitute property damage as well as economic damage. *See, e.g., Gaylord Chem. Corp. v. Pro-Pump, Inc.*, 753 So.2d 349, 353–54 (La.Ct. App.2000) (finding property damage under the terms of insurance policy in case where pump failed to operate as represented at time of sale); *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 679 A.2d 540, 545 (1996) (determining that property damage existed for loss of use where septic system failed after purchase of property); *see also Wood v. Safeco Ins. Co.*, 980 S.W.2d 43 (Mo.Ct.App. 1998).[8]

Insurers point to Gregory T. Lawrence, *Sheets v. Brethren Mutual: Maryland's High Court Misconstrues CGL to Cover Excluded Economic Loss Caused be Negligent Misrepresentation*, 27 U. Balt. L.Rev. 189, 221–24 (1997), to argue that harm flowing

---

**7.** See also *M.L. Foss, Inc. v. Liberty Mut. Ins.*, 885 P.2d 284, 285 (Colo.App.1994), in which a land purchaser sued M.L. Foss for breach of contract and fraud in connection with environmental contamination of property the party purchased from M.L. Foss. M.L. Foss then sought a defense and indemnification from its insurers. *Id.* The court of appeals agreed with the trial court that no coverage was available, because the underlying claims alleged only intentional or knowing misrepresentations and did not include an "occurrence, i.e. an 'accident' resulting in 'property damage neither expected nor intended,'" as required by the policy. *Id.* at 285–86. Further, even if the plaintiff had sufficiently alleged an "occurrence," the court of appeals also determined that the complaint sought only monetary damages—those damages represented by the difference in the value of the property between what was represented by the seller and the actual value considering the undisclosed contamination. *Id.* The case did not include any damages associated with mitigating the actual damage to the property or loss of use associated with the damage; and the case did not involve an "accident" as does this case. The case is therefore factually distinguishable. To the extent, however, that reasoning in the opinion in *M.L. Foss* in inconsistent with our holding in this case, we disapprove it.

**8.** The court of appeals characterized this line of cases as the minority view.

from misrepresentations is not "property damage," but rather pure "economic loss." Lawrence contends that a majority of states have followed the *Safeco* decision, rather than *Sheets v. Brethren Mutual*, such that where a purchaser seeks damages for economic loss—the difference between the actual value of the property and the value of the property as represented—no liability exists for property damage. *Id.* at 224. We are not persuaded.

We are guided in our analysis by various factors applicable to this case: i. the policy provides not only for property damage coverage, but also for coverage associated with the loss of use of property; ii. the policy does not exclude contract causes of action or economic losses, as do the policies in a number of the cases denying coverage; iii. an ambiguity must be interpreted to the benefit of the insured; iv. Coeur did allege damage to the Mine, costs associated with remediating that damage and loss of use of the Mine occasioned by the damage; and lastly, v. this case is before us on a motion for summary judgment.

■ Considering all of those factors, we conclude that a genuine issue of material fact remains as to whether Cyprus incurred liability for property damage under the policies. We find no authority showing that liability cannot include a mix of property damages and other kinds of damages.

### ii. Causal Nexus

■ Assuming that Coeur sought and received damages for the injury to the Mine itself, we must still determine whether the alleged misrepresentations of Cyprus "caused" a "loss" in such a way as to trigger indemnification coverage under the policy. The court of appeals held that in order to receive indemnification under the policy, Coeur would have had to show that Cyprus' alleged misrepresentations in some way caused the damage to the property. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 55 P.3d 200, 203 (Colo.App.2002).

Cyprus urges a different interpretation of the policy. Cyprus contends that coverage exists where the property damage results from a "loss," or "an accident, including continuous or repeated exposure to the same general harmful condition." Cyprus alleges that the property damage resulted from the "accident" or "harmful condition" of the landslide for which Coeur sought to hold Cyprus liable because Cyprus did not disclose that there was a risk of that harm. Conversely, Insurers contend that the misrepresentations must cause the "accident" which in turn causes the property damage.

■ As quoted above, the policy provides that:

> In the event that a claim ... against the Insured ... arising from a Loss ... Underwriters will indemnify the Insured ... for that amount ... the Insured shall be obligated to pay by reason of the liability ... *imposed upon the Insured by law* ... for damages on account of ... Property damage ... *resulting from each Loss* ....

(emphasis added). The court of appeals construed the term "resulting from" to create the causal nexus between any damage to the Mine and any misrepresentations by Cyprus. The term "resulting from" is not defined by the policy, and "[w]hen faced with terms in an insurance policy that are not defined, [Colorado law] dictates that such terms be given their plain, ordinary meaning and interpreted according to the understanding of the average purchaser of insurance." *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 617 (Colo.1999).

Looking to the plain and ordinary meaning of this passage, the causal connector, "resulting from", attaches to the term "loss," not "damages." "Loss" then refers to an "accident." The policy language also expands insurers' indemnification obligations beyond that property damage directly caused by Cyprus' action by including the language: "damages on account of ... Property damage." Based on a plain reading of the provision, indemnification is triggered where liability is imposed on Cyprus for damages on account of property damage caused by an accident.

■ Construing the policy in favor of providing coverage, we again determine that Cyprus is entitled to indemnification when it

faces legal liability for damages to property that are caused by an accident, e.g. the landslide. If Insurers intended a different result, it was incumbent upon them to so delineate. Insurers seeking to avoid liability "must do. so in clear and unequivocal language and must call such limiting conditions to the attention of the insured." *Tynan's Nissan, Inc. v. Am. Hardware Mut. Ins. Co.*, 917 P.2d 321, 324 (Colo.App.1995). We find no such limitations present in the policies.

◼ In fact, in an attempt to interpret the policy as a whole, we also note that Cyprus' policies each contained a "completed operations" clause.[9] A finding that misrepresentations cannot lead to property damage would be in direct conflict with the language of the completed operations clause and so holding would eliminate its effect. The clause reads:

> The words "COMPLETED OPERATIONS LIABILITY HAZARD", wherever used in this Policy, mean Personal Injuries and/or *Property Damage which arise out of operations or reliance upon a representation* or warranty made at the time with respect thereto, but only if the Personal Injuries or Property Damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Insured.

The provision specifically contemplates that "property damage" can arise from "reliance on a representation." To hold that a misrepresentation cannot, under any circumstances, cause or lead to property damage vitiates this provision. This is not acceptable, as courts are charged with seeking "to give effect to all provisions so that none will be rendered meaningless." *Pub. Serv. Co. v. Wallis & Co.*, 986 P.2d 924, 933 (Colo.1999) (quoting *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo.1984)).

The court of appeals points to several jurisdictions holding that there cannot be a causal nexus between misrepresentations and property damage. *See, e.g., Safeco Ins. Co. v. Andrews*, 915 F.2d 500, 502 (9th Cir.1990) (finding that the misrepresentations caused the economic damages, but finding that a misrepresentation was not an "occurrence" for which liability would be triggered under the policy); *State Farm Fire & Cas. Co. v. Brewer*, 914 F.Supp. 140, 143 (S.D.Miss.1996) (finding no proximate cause between alleged misrepresentation and property damage, as damage occurred prior to the misrepresentation); *Martin v. State Farm Fire & Cas. Co.*, 146 Or.App. 270, 932 P.2d 1207, 1213 (1997) (holding that no causal connection was alleged between negligent misrepresentations and property damage); *State Farm Lloyds v. Kessler*, 932 S.W.2d 732, 737 (Tex.App.1996) (finding only economic damages, but stating that even if property damages were alleged, misrepresentations are not "conditions" that the property could be "exposed" to as required by the policy). Each case necessarily turns on the language of the policy at issue in that case and the nature of the claim made. We do not view the cited cases as persuasive, given the language of these policies and the nature of Coeur's claims.

◼ The facts before us do, unequivocally, involve an accident: the subsidence of the Mine. They do not involve a circumstance in which the value of the stock was not as represented because of undisclosed financial liabilities or the depth of the mineral deposit. There was an accident here.

We need not reach as far as the court in *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 679 A.2d 540 (1996), which uses a more relaxed standard for evaluating the necessary occurrence or accident. The court in *Sheets* analyzed whether insurers owed a duty to defend and a duty to indemnify in a lawsuit alleging that the sellers of a farmhouse intentionally and negligently misrepresented that the septic system was in good working order. *Id.* at 541. Finding that the loss of use of the property constituted "property damage" under the policy,[10] the Court went on to determine if negligent misrepresentations met the definition of "occurrence," or "accident" under the policy. *Id.* at 545–51. The Court analyzed the apparent split in

---

9. This provision is not directly at issue in the case.

10. The insured there only sought coverage under the "property damage" clause for the loss of use of the system, not for the repairs.

authority over the issue, and concluded that an interpretation of a policy denying coverage for damages that are the natural and probable consequences of negligent acts is too limiting. *Id.* Instead, the Court read the definition of "accident" to include negligent misrepresentation if the insured did not expect or foresee the resulting damage. *Id.* at 551. *See also Gaylord Chem. Corp. v. Pro-Pump, Inc.,* 753 So.2d 349, 353 (La.Ct.App. 2000) (allowing property damages where pump failed to operate as represented at time of sale).

Accordingly, under a plain reading of the policy, we conclude that the indemnification provisions apply when Cyprus faces legal liability because of property damage that results from an accident, in this case the landslide. The policy does not require that Cyprus must have caused the landslide, but rather only that Cyprus must be found, or agree to be held, liable for the same.

## VII. Conclusions

Because we view the case as presenting material issues of disputed fact, we now reverse the court of appeals' decision upholding the trial court's entry of summary judgment and remand for proceedings consistent with this opinion.