2012 COA 173

Arlene **ABADY, Duane Duffy, Pete M. Montoya, Caitlin Lowe, Denali Lowe, Pamela A. Wilson, and Estate of Wallace N. Wilson, Plaintiffs–Appellants,**

v.

**CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO MORTGAGE BANKERS BOND NO. MBB–06–0009, Defendant–Appellee.**

**No. 11CA1870.**

Colorado Court of Appeals,
Div. III.

Oct. 11, 2012.

Moye White LLP, Eric B. Liebman, Adam L. Massaro, Denver, Colorado, for Plaintiffs–Appellants.

Snell & Wilmer L.L.P., Michael E. Lindsay, Jessica E. Yates, Denver, Colorado; Sedgwick LLP, Christopher C. Novak, Todd D. McCormick, New York, New York, for Defendant–Appellee.

Opinion by Judge ROY.

¶ 1 Arlene Abady, Duane Duffy, Pete M. Montoya, Caitlin and Denali Lowe, Pamela A. Wilson, and the Estate of Wallace N. Wilson (collectively investors) appeal the trial court's summary judgment in favor of Certain Underwriters at Lloyd's London (Lloyd's). We affirm.

## I. Background

¶ 2 In the general allegations of their complaint, investors allege that Matthew Witt (officer), the Chief Executive Officer of Commercial Capital, Inc. (CCI), formed CCI as a real estate lending company providing short-term financing for commercial construction projects. CCI engaged in a practice known as "hard money lending," providing commercial real estate loans to borrowers who could not otherwise obtain loans from lenders with more restrictive lending criteria.

¶ 3 During 2006 and 2007, CCI, through efforts by officer and other officials and employees, began to solicit private investors to invest funds into the company. The proposed investment involved the acquisition of debt securities documented by a subscription agreement and a promissory note from CCI (the notes). As part of its solicitation efforts, CCI held seminars for potential investors wherein CCI agents, including officer, described CCI, its investment characteristics, investor security, the high rate of return, and a guaranteed return of the principal amounts invested and any interest thereon.

¶ 4 Investors allege that officer was involved in all day-to-day operations, including all dealings with and representations to investors. The alleged misrepresentations included, among other things that: (1) CCI had a $5 million policy in place to protect investors' principal against loss; (2) the investments had high guaranteed rates of return; (3) the interests sold were registered with the Securities and Exchange Commission; (4) the investments were "more liquid than other private real estate strategies" and "enjoyed a superior risk return profile due to inefficiencies in the commercial lending market"; (5) CCI would conduct vigorous due diligence before granting any loans; and (6) the investments and any interest would be personally guaranteed by officer. Investors alleged that based upon these and other misrepresentations, they collectively invested in, or loaned money to, CCI in an amount in excess of $1 million. According to investors, CCI is in default on the notes and officer has not honored his personal guarantee.

¶ 5 While there is a statement in investors' summary judgment materials filed in the trial court that some of the funds received from investors were used for operating expenses, generally, CCI loaned the funds to customers, principally developers, who could not borrow from the banks and other lending institutions with higher credit requirements. Again, according to investors' summary judgment materials (1) the notes payable to investors, with rare exception, called for interest at rates between 18% and 25% per annum; and (2) the notes payable to CCI by its customers were at substantially lower interest rates but with loan fees approaching 50% of the loan's principal amount.

¶ 6 On April 22, 2009, CCI filed a voluntary petition for Chapter 11 bankruptcy. Shortly thereafter, certain creditors including investors filed a motion for relief from the automatic stay in order to pursue CCI's rights under Insuring Clause A 1(b) of the Mortgage Bankers Bond No. MBB–06–00090 (the bond), which was issued to CCI by Lloyd's. The bankruptcy court granted the motion, and the bankruptcy trustee then assigned all of CCI's rights, title, and interest in the bond to investors, retaining thirty percent of the gross recovery less reasonable attorney fees and $50,000 to be paid to investors, with the balance to the investors.

¶ 7 The insuring clause provides:

DISHONESTY INSURING CLAUSE A1

Direct financial loss sustained by the Assured at any time and discovered by the Assured during the Bond Period by reason of and directly caused by

[a] Theft of Money, Securities and other Property by any Employee of the Assured, whether committed alone or in collusion with others, or

[b] any other dishonest acts by any Employee of the Assured, whether committed alone or in collusion with others, committed by said Employees with the manifest intent to obtain Improper Personal Financial Gain for said Employee, or for any other person or entity intended by the Employee to receive such Improper Personal Financial Gain.

The term "direct financial loss" is not defined in the policy.

¶ 8 Investors filed a complaint against CCI, officer, and Lloyd's. Investors alleged causes of action against CCI and officer for violations of the Colorado Securities Act, sale of unregistered securities, common law fraudulent misrepresentation, constructive fraud, negligent misrepresentation or omission, civil theft, breach of fiduciary duty, and vicarious liability.

¶ 9 Investors also asserted two first-party claims against Lloyd's: the first, as assignee of the bond and the second, a garnishment claim asserting a right to garnish Lloyd's after obtaining judgment against CCI. These claims incorporated the general allegations of the complaint, which in turn alleged wrongdoing by CCI and its officers and employees in the marketing and management of CCI, with an additional allegation stating: "The above described acts constitute theft and other dishonest acts by an employee of CCI with the manifest intent to obtain an Improper Financial Gain within the meaning of Section A, Insuring Clause A1, as these capitalized terms are defined in the policy." In the garnishment claim, the investors also alleged: "At such time as [investors] procure a judgment against CCI, CCI will have incurred a loss under the Policy."

¶ 10 Following a period of discovery, Lloyd's filed a motion for summary judgment, which the trial court granted. In its order, the trial court concluded, as pertinent here, that (1) the bond is a fidelity bond and not a surety bond; (2) the bond terms were unambiguous; (3) the plain language of the bond protects only CCI; (4) the assignment of CCI's rights to investors did not convert their third-party claims into first-party claims; and, therefore, (5) investors' claims were not recoverable under the bond. This appeal followed.

## II. Standard of Review and Applicable Law

### A. Summary Judgment Standard of Review

¶ 11 We review a grant of a summary judgment de novo. *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.*, 901 P.2d 1251, 1256 (Colo.1995). Summary judgment is a drastic remedy and is warranted only upon a clear showing that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Greenwood Trust Co. v. Conley*, 938 P.2d 1141, 1149 (Colo.1997).

¶ 12 The moving party has the initial burden to show that there is no genuine issue of material fact. *See Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 712 (Colo.1987). Once the moving party has met its initial burden of production, the burden shifts to the nonmoving party to establish that there is a triable issue of fact. *See Ginter v. Palmer & Co.*, 196 Colo. 203, 206, 585 P.2d 583, 584 (1978). The nonmoving party must receive the benefit of all favorable inferences that may be reasonably drawn from the undisputed facts. *Tapley v. Golden Big O Tires*, 676 P.2d 676, 678 (Colo.1983). All doubts as to whether an issue of fact exists must be resolved against the moving party. *See Dominguez v. Babcock*, 727 P.2d 362, 365 (Colo.1986).

### B. Fidelity Bonds

¶ 13 Investors concede on appeal that the policy is a fidelity bond. A fidelity bond is a contract "whereby one for consideration agrees to indemnify the insured against [a] loss arising from the want of integrity, fidelity, or honesty of employees or other

persons holding positions of trust." 11 *Couch on Insurance* § 160:7 (3d ed. 2005). Though denominated a bond, fidelity contracts are in legal effect analogous to policies of insurance and, therefore, the rules applicable in construing insurance contracts apply. *American Bonding & Trust Co. v. Burke,* 36 Colo. 49, 54, 85 P. 692, 693 (1906); *see also* 11 *Couch* § 160:14 ("A fidelity bond, per se, is clearly valid and is subject to all rules of insurance.... Similarly, the general rules of [insurance] policy construction are applicable to the bond situation.").

 ¶ 14 The interpretation of an insurance contract is a matter of law that we review de novo. *Fire Ins. Exchange v. Bentley,* 953 P.2d 1297, 1300 (Colo.App.1998). "When construing the terms of insurance policies, we apply principles of contract interpretation." *Fire Ins. Exchange v. Sullivan,* 224 P.3d 348, 351 (Colo.App.2009). When interpreting an insurance policy, as with contracts, we attempt to carry out the intent and reasonable expectations of the parties at the time they drafted the policy. *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.,* 90 P.3d 814, 819 (Colo.2004).

 ¶ 15 When, as here, the terms of the policy at issue are not defined, we give the words their plain, ordinary meaning. *Roinestad v. Kirkpatrick,* 300 P.3d 571, 575 (Colo.App.2010) (*cert. granted* 2011 WL 1782103 (Colo. May 9, 2011)). We enforce the plain language of the policy unless it is ambiguous and avoid any strained and technical constructions. *Sullivan,* 224 P.3d at 351.

 ¶ 16 A policy is ambiguous when it is susceptible of more than one reasonable interpretation. *Hoang v. Assurance Co.,* 149 P.3d 798, 801 (Colo.2007) (citation omitted). "We determine ambiguity based on the facts and circumstances of the particular case before us." *Roinestad,* 300 P.3d at 575 (citing *TerraMatrix, Inc. v. U.S. Fire Ins. Co.,* 939 P.2d 483, 487 (Colo.App.1997)).

 ¶ 17 Although insurance contracts are liberally construed in favor of coverage for the insured, "courts should be wary of rewriting provisions." *Cyprus Amax Minerals Co. v. Lexington Ins. Co.,* 74 P.3d 294, 299 (Colo.2003). Courts should read the various policy provisions as a whole, and may neither add provisions to extend coverage, nor delete them so as to limit coverage. *Id.* Due to the unique nature of insurance contracts, courts construe ambiguous provisions in favor of providing coverage to the insured. *Id.*

### C. Assignment

 ¶ 18 With respect to an assignment, an assignee stands in the assignor's shoes "and takes 'only as good a claim as his assignor had.'" *Regency Realty Investors, LLC v. Cleary Fire Protection, Inc.,* 260 P.3d 1, 6 (Colo.App.2009) (quoting *McCormick v. Diamond Shamrock Corp.,* 175 Colo. 406, 409, 487 P.2d 1333, 1335 (1971)). An assignee has no greater rights than his or her assignor. *Pierce v. Ackerman,* 488 P.2d 1118, 1120 (Colo.App.1971) (not published pursuant to C.A.R. 35(f)). Therefore, investors' third-party claims—to the amounts, plus interest, that they invested in CCI—have not become first-party losses merely because investors now stand in CCI's shoes as first-party claimants. Rather, investors may only recover those losses that CCI could have recovered for itself.

### III. Question Presented

¶ 19 In our view, the dispositive question presented here is whether under this coverage, Lloyd's would be liable to CCI for the damages suffered by investors arising out of the wrongful acts of its officers and employees in marketing interests in CCI to investors. We conclude that the answer is no because the losses asserted by investors do not constitute direct losses to CCI as contemplated by the bond.

### IV. Direct Losses

 ¶ 20 Investors argue that the phrase "direct financial loss" is ambiguous and, therefore, the policy should be construed in favor of providing coverage. We are not persuaded that the phrase is ambiguous.

¶ 21 Here, the bond provides coverage for direct financial loss sustained by CCI. Because "direct financial loss" is not a term

defined by the fidelity bond, we start with the plain and ordinary meaning of the phrase. The common meaning of "direct" is "free from extraneous influence; [or] immediate." *Black's Law Dictionary* 1030 (9th ed. 2009).

¶ 22 Citing to foreign authorities, investors argue that the phrase "direct financial loss" has, under some circumstances, been interpreted to include losses resulting from an insured's liability to third parties. *See F.D.I.C. v. United Pacific Ins. Co.*, 20 F.3d 1070, 1079 (10th Cir.1994); *Continental Savings Ass'n v. U.S. Fidelity & Guaranty Co.*, 762 F.2d 1239, 1243 (5th Cir.1985); *RBC Dain Rauscher Inc. v. F.D.I.C.*, 370 F.Supp.2d 886, 890 (D.Minn.2005). They also acknowledge authorities taking a narrower view. *See Cont'l Cas. Co. v. First Nat'l Bank*, 116 F.2d 885, 886–87 (5th Cir. 1941); *Fitchburg Sav. Bank v. Mass. Bonding & Ins. Co.*, 274 Mass. 135, 174 N.E. 324, 328 (1931). They refer us to these two lines of authority to support their argument that the phrase is subject to two reasonable interpretations and, therefore, is ambiguous. However, in our view, we must first consider the nature of the bond as a whole.

¶ 23 The policy here is a fidelity bond which is to be distinguished from a liability policy. A fidelity bond "cover[s] the loss of property owned by the insured or held by the insured [and for which it is legally liable], as a result of employee dishonesty and other perils." 11 *Couch* § 167:43.

> A liability policy protects the insured against claims brought by third parties who have been injured by the insured's conduct.... In contrasting liability insurance with a fidelity bond, it is helpful to note that in the liability context, the *insured's loss is indirect; it is a third party who directly suffers the loss.*

*City of Burlington v. Western Sur. Co.*, 599 N.W.2d 469, 472 (Iowa 1999) (emphasis added) (citing 1 Eric Mills Holmes & Mark S. Rhodes, *Holmes's Appleman on Insurance* § 3.3, at 349 (2d ed. 1996)); *see also Qwest Communications Int'l, Inc. v. QBE Corporate Ltd.*, 829 F.Supp.2d 1037, 1040 (D.Colo. 2011) ("Commercial crime policies are not intended to be liability policies.").

¶ 24 In this case, the distinction between fidelity bonds and liability policies matters because liability coverage was available under the policy, but was not purchased by CCI. Such coverage would have provided indemnity for "any Claim first made against [CCI] by a third party ... for direct financial loss sustained by such third party as a direct result of any Wrongful Act either by [CCI] or by any person for whose such Wrongful Act [CCI] is legally liable." Further, liability policies, almost without exception, require that the insuror participate in, and frequently fund the cost of, the defense in order to, among other reasons, permit the insuror to protect its own interests. This policy contains no such provision with respect to the coverage at issue here.

¶ 25 Therefore, based upon the plain and ordinary meaning of the phrase "direct financial loss," and the purpose of the policy, as well as our assessment of the policy as whole, we conclude that "direct financial loss" sustained by CCI unambiguously refers only to the immediate loss of CCI's property through the dishonesty of its own officers and employees. It does not provide coverage to CCI against the risk that its officers and employees may engage in wrongful conduct directed at, and causing damages to, third parties, including investors.

¶ 26 Here, CCI is liable for losses suffered by investors, if at all, under a theory of vicarious liability. To accept investors' definition of "direct financial loss" would create the potential that any loss would be deemed a direct loss. Such an interpretation "would eliminate the distinction between a direct loss and an indirect loss and would transform the [bond] into a liability policy." *Qwest*, 829 F.Supp.2d at 1040.

## V. *Massachusetts Mutual Life Insurance v. Certain Underwriters of Lloyd's of London*

¶ 27 To support the proposition that coverage extends to their losses, investors, on appeal, have placed considerable reliance on the analysis in *Massachusetts Mutual Life Insurance Co. v. Certain Underwriters at Lloyd's of London*, 2010 WL 2929552 (Del.

Ch. No. 4791–VCL, July 23, 2010) (unpublished opinion). At the outset, while the Delaware Chancery Court is deservedly held in very high esteem, *Massachusetts Mutual* is an unpublished interlocutory order denying a motion to dismiss applying Massachusetts law. Therefore, it does not announce any rule of law binding on the courts of either Delaware or Massachusetts, much less to this case. Therefore, it has little or no precedential value. In addition, the case was cited in investors' summary judgment materials for the proposition that a fidelity bond is a unique form of suretyship agreement with its origins in the early twentieth century, and not for the proposition before us.

¶ 28 However, in granting the summary judgment here, the trial court distinguished it, and it is the subject of considerable discussion in the briefs of both parties on appeal. Therefore, despite its limitations, we will address its analysis and distinguish it in much the same manner as did the trial court.

¶ 29 While the facts and analysis in the chancery court opinion are both somewhat more extended, for our purposes here we note that Massachusetts Mutual Life Insurance Company was the parent company of a number of mutual funds and other investment vehicles which invested in Bernard L. Madoff's now infamous Ponzi scheme. Massachusetts Mutual had purchased a fidelity bond from Lloyd's that covered all of its subsidiaries and mutual funds. After the collapse of Madoff's scheme, Massachusetts Mutual's investors sued the mutual funds for their losses and the mutual funds sought indemnity and defense costs from Lloyd's under the fidelity bond. As pertinent here, the family of funds involved in the court's opinion were known as the "Rye Funds."

¶ 30 Lloyd's filed a motion to dismiss on the ground that the complaint did not state a claim upon which relief could be granted. Therefore, the chancery court's analysis was limited to consideration of the allegations of the complaint, which it was required to take as true. The insuring language stated:

THE LOSSES COVERED BY THIS BOND ARE AS FOLLOWS: FIDELITY (A)(i) Loss resulting directly from one or more dishonest or fraudulent acts of an Employee or general agent of the Assured, committed anywhere and whether committed alone or in collusion with others, *including loss of Property resulting directly from such act of an Employee or general agent.*

(Emphasis added.) The policy's definition of "Employee" included "investment advisor."

¶ 31 The complaint alleged, and the argument posited by the Rye Funds was premised on the allegations, that (1) the Rye Funds deposited funds with Madoff to manage as an investment advisor (employee); (2) the funds remained the property of the Rye Funds while in the possession of Madoff; and (3) the funds were misappropriated by Madoff for his own benefit. This relationship so described is similar to a brokerage account.

¶ 32 Lloyd's asserted that the Rye Funds were investors in Madoff's investment vehicles and that it did not retain direct ownership of the funds. The chancery court concluded that if Lloyd's was correct as to the ownership of the funds after they were deposited with Madoff, there would be no coverage under the fidelity bond. However, the chancery court described the complaint as follows:

According to the Complaint, [Madoff] was retained as an investment advisor (or investment manager) to manage funds belonging to the Rye Funds. The relationship with [Madoff] was structured along the lines of a traditional client-stockbroker relationship in which the stockbroker has discretionary authority to trade. Under this framework, the brokerage opens an account in the client's name, and the account proceeds and securities are held beneficially for the client.

This is a materially different relationship than the fund structure used by the Rye Funds. As alleged in the Complaint, the Rye Funds retained ownership of the funds they invested with Madoff. The Complaint alleges that the Rye Funds suffered a direct loss of funds that they owned.

The chancery court then concluded that, based solely on the allegations in the com-

plaint, the fidelity bond could provide coverage.

¶ 33 Here, there is no allegation in the complaint, provision in the contracts or documents, or affidavit from any witness that attempts to characterize the relationship between investors and CCI in a manner similar to that of the Rye Funds and Madoff. There is one potentially related statement in investors' summary judgment materials: "Based on the foregoing, Lloyd's denial of coverage for the misappropriation of [investors'] property while in the possession and control of CCI as the insured is flat-out improper." However, this statement was made with respect to investors' argument that, as assignee, they are bringing a first-party, not a third-party, claim; the statement was not made with respect to the coverage issue.

¶ 34 *Massachusetts Mutual* is, therefore, distinguishable because (1) the chancery court's conclusion turned on the "lost property" coverage in the policy, which dealt with funds held by the insured in trust in a segregated account, which is not present here; (2) there is no evidence here which would support a conclusion that the investment or loan proceeds remained the property of the investors after it was transferred to CCI; and (3) no one has suggested that CCI was an employee or agent of the investors. Any one of these distinguishing characteristics would be sufficient, standing alone, to justify us in concluding that *Massachusetts Mutual* is not persuasive here, and we so conclude.

## VI. Conclusion

¶ 35 We conclude that the losses asserted by investors do not constitute direct financial losses to CCI. Investors, as assignees of CCI's rights and remedies, are precluded from seeking recovery for these claims under Insuring Clause A 1[b] of the policy.

¶ 36 The trial court's summary judgment in favor of Lloyd's is affirmed.

Judge DAILEY and Judge RICHMAN concur.