RAYMOND P. MOORE, United States District Judge
This matter comes before the Court with the filing of the following motions: (1) defendant CFI-Global Fisheries Management's ("CFI") motion for partial summary judgment (ECF No. 77); (2) plaintiff Rockhill Insurance Company's ("Rockhill") motion for summary judgment (ECF No. 80); (3) defendant Heirloom I, LLC's ("Heirloom") motion for summary judgment (ECF No. 84); (4) Rockhill's motion to strike CFI's response (ECF No. 109); (5) Heirloom's motion for oral argument (ECF No. 122); and (6) Rockhill's motion to strike defendants' jury demand (ECF No. 124).
With all of the above-mentioned motions being fully briefed, the Court makes the following findings.[1]
I. Legal Standard for Summary Judgment
Summary judgment is appropriate "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Initially, the movant bears the "responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If this burden is met, then the non-moving party must set forth specific facts showing that there is a genuine dispute for trial. Id. at 324, 106 S.Ct. 2548. If the moving party bears the burden of persuasion on a claim at trial, that party must support its motion with evidence that, if uncontroverted, would entitle it to a directed verdict at trial. Anderson v. Dep't of Health & Human Servs. , 907 F.2d 936, 947 (10th Cir. 1990) (citing Celotex Corp. , 477 U.S. at 331, 106 S.Ct. 2548 ).
A fact is material if it has the potential to affect the outcome of a dispute under applicable law. Ulissey v. Shvartsman , 61 F.3d 805, 808 (10th Cir. 1995). An issue is genuine if a rational trier of fact could find for the non-moving party. Adams v. Am. Guarantee & Liab. Ins. Co. , 233 F.3d 1242, 1246 (10th Cir. 2000). In performing this analysis, the factual record and any reasonable inferences therefrom are construed in the light most favorable *1114 to the non-moving party. Adams , 233 F.3d at 1246. However, a mere "scintilla of evidence" is insufficient to avoid summary judgment. Turner v. Public Service Co. of Colorado , 563 F.3d 1136, 1142 (10th Cir. 2009). Instead, a nonmovant "must proffer facts such that a reasonable jury could find in her favor." Id.
II. Discussion[2]
Before beginning its analysis, the Court makes a few preliminary observations. Based upon the Court's review, there are five principal legal issues in this case: (1) on what basis were damages awarded to Heirloom in the underlying arbitration; (2) whether the damages awarded to Heirloom are damages covered by the professional liability policy between Rockhill and CFI; (3) if so, whether an exclusion in the professional liability policy excludes the damages from coverage; (4) whether attorney fees and costs awarded in the arbitration are covered by the professional liability policy; and (5) whether CFI's bad faith claims viable. There are other issues, but, as far as the Court is concerned, those are the five principal legal issues in this case. The Court will address each in turn.
The Court further observes that three motions for summary judgment have been filed in this case, all of which in some form or another address the issues outlined above. The Court does not intend to address each motion for summary judgment individually. The parties' arguments across the span of their motions, responses, and replies are largely the same. As such, the Court simply intends to reference the parties' arguments with respect to any specific issue irrespective of whether they appear in a motion, response, or reply. Once the underlying issues are resolved, the Court will be able to determine which motion should be granted and which should be denied.
Along with the three motions for summary judgment, the parties have also filed corresponding statements of purported undisputed material facts. As far as the Court is concerned, the pertinent evidence upon which those statements of fact rely is straightforward. The Court, thus, chooses to cite to the underlying evidence itself when discussing the facts of this case, rather than the parties' take on the evidence presented in their statements of fact.
A. On What Basis Were Damages Awarded to Heirloom in the Underlying Arbitration?
1. The Evidence
This case involves the duty to indemnify. In Colorado, the complaint in the underlying action is the "starting point" in determining whether a duty to indemnify an insured arises. Cyprus Amax Minerals Co. v. Lexington Ins. Co. , 74 P.3d 294, 301 (Colo. 2003). A court may also look to the facts as they developed at trial and the ultimate judgment. Id. The parties have submitted an Arbitration Demand (ECF No. 78-2), Heirloom's Final Hearing Brief (ECF No. 78-4), the Interim Award of the Arbitrators (ECF No. 81-26), and the Final Award of the Arbitrators (ECF No. 78-12). The Court uses these documents in assessing on what basis damages were awarded to Heirloom in the underlying arbitration.[3]
*1115 The Arbitration Demand reflects the following. Heirloom and CFI entered a contract, dated August 30, 2012, for CFI to research, design, and implement a fisheries enhancement project on, inter alia , the Weminuche Creek ("the Fisheries Contract"). (ECF No. 78-2 at 3.)[4] Heirloom alleged that CFI breached the Fisheries Contract in various ways, including CFI's poor design and execution of the fisheries enhancement, CFI's failure to rectify deficiencies or honor its warranty, and CFI's failure to deliver certain documents. Heirloom further alleged that CFI's services were negligent and were the proximate cause of damages. Heirloom further alleged that it paid CFI to cure CFI's faulty work, including paying $21,600 to repair a river bank with stones, but these efforts to fix the problems were also of poor quality and unsuccessful. Heirloom further alleged that CFI made material misrepresentations, in that CFI over-charged for the efforts to fix CFI's work and CFI told Heirloom that willow strands were necessary for one of the projects. Heirloom sought, inter alia , the return of $775,000 paid to CFI for enhancing the creek and $35,000 paid to CFI for attempting to cure CFI's faulty work. (Id. )
Heirloom's Final Hearing Brief reflects the following. CFI completed its work under the Fisheries Contract in about October 2013. (ECF No. 78-4 at 3.) CFI's work was destroyed by the natural process of the creek four times in three consecutive years; once before completion in 2013, twice in 2014, and once in 2015. After the final failure, Heirloom gave up trying to work with CFI, retained a well qualified expert to prepare a new plan, and retained a new company to do the labor and materials for the fisheries enhancement. (Id. ) Heirloom hired Dave Rosgen ("Rosgen") to create a new river design after the failure of CFI's design. (Id. at 4.) Rosgen's company is called Wildland Hydrology ("Wildland"). (Id. ) Heirloom also hired Elk River Construction ("Elk River") to implement Rosgen's plan. (Id. at 5.) Heirloom demanded a refund of the money paid to CFI, but CFI refused. (Id. at 3.)
CFI also refused to provide data that should have been gathered pursuant to the Fisheries Contract. (Id. ) CFI did not do all of the data gathering it had contracted to do, and CFI could provide no documentary proof that it actually performed many of the services CFI claimed to have done. (Id. at 6.) There was no field data for hydraulic studies, which was "arguably" the most important data for a fish habitat enhancement professional, as, without it, any plan prepared is vulnerable to being washed away by the next rain and poses a risk that a stream will be prone to erosion. (Id. at 7-8.) This was precisely the result of CFI's design, repairs, and work. (Id. at 8.) CFI did not have anyone on staff with a college degree or post-graduate work in physics or advanced high school mathematics. (Id. )
Heirloom paid CFI in full, $775,000, for the stream enhancement. (Id. ) In October 2014, after the stream banks collapsed in the water for the third time in about a year, Heirloom paid $21,600 to CFI for a solution that involved lining a problem bank with rocks. (Id. at 9.) This solution lasted less than a month before the stream eroded behind the rocks, collapsing the bank again. (Id. )
At this point, Heirloom reached out to Rosgen, a world renowned expert in river enhancement, and asked him to repair CFI's work. (Id. ) Rosgen responded that CFI's work could not be fixed because the design was so fundamentally flawed that *1116 the project would have to be started over with a completely new design. (Id. at 9-10.) CFI's work was so deficient in design and execution that it could not br repaired without starting over. (Id. at 10.) Virtually all of CFI's work was gone by 2015 and the river was in worse shape than when CFI started. (Id. ) Heirloom was left with a "complete" redo of both design and build. (Id. at 11.)
In total, Heirloom paid CFI $834,945. (Id. at 10.) As relief, Heirloom requested the following. Its money back. (Id. at 11.) Alternatively, if the arbitration panel believed that a more appropriate measure of damages was the cost of repair, Heirloom spent $35,795.48 for a new design, $464,640.84 in labor and costs, and estimated a further $300,000 to complete the repair-an expenditure of approximately $764,640.84. Heirloom stated that this was a design and build case, as Heirloom hired CFI to come up with a plan and implement it. (Id. ) Heirloom stated that it bought the delivery of an "A-1" world class fishery from CFI, and CFI did not deliver. (Id. at 11-12.)
The Interim and Final Awards of the Arbitrators reflect the following.[5] None of the parties requested a reasoned award, so a standard award without explanation was issued. (ECF No. 78-12 at 2.) Heirloom was awarded $609,994.91 "as damages on [Heirloom's] claims." (Id. ) The parties stipulated to an award of $265,000 for attorney's fees and costs. (Id. at 3.) Attached to the Final Award of the Arbitrators was a spreadsheet containing various invoices ("the spreadsheet"). The spreadsheet reflects the following. The invoices totaled $527,933.32. (Id. at 4.) Of this, $23,000 was money paid to CFI, $40,295.48 was money paid to Wildland, and $464,637.84 was money paid to Elk River. The remaining cost of construction was estimated at $81,994.91. This produced a total of $609,928.23.[6] (Id. )
2. Analysis
What does all this mean? The Court believes it is fairly straightforward. Between the two alternative requests for damages that Heirloom proposed in its Final Hearing Brief, Heirloom was awarded the latter-as Heirloom put it therein, damages for the cost of repair. (See ECF No. 78-4 at 11.) This is amply demonstrated by the spreadsheet, given that it includes a line item for the completion of construction (see ECF No. 78-12 at 4), which was a specific part of Heirloom's request for damages in its alternative damages approach (see ECF No. 78-4 at 11). In other words, Heirloom was not awarded damages for its "money back," but damages to "repair" CFI's work. As Heirloom put it, "a complete redo of both design and build...." (Id. )
The Court does not construe Rockhill's arguments as saying anything noticeably different, given that Rockhill characterizes some of the invoices as necessary to "repair" CFI's work. (See ECF No. 80 at 15.) To the extent CFI argues otherwise (see ECF No. 77 at 12-18), the Court simply disagrees. CFI argues that Heirloom did *1117 not repair or replace CFI's work. CFI's own argument belies its contention. Notably, CFI acknowledges that, by the time of arbitration, CFI's work had "already washed away." (Id. at 13.) In other words, CFI's work was no longer at the creek. How did Heirloom attempt to fix this problem? By hiring new firms to design and implement a new enhancement project. In other words, to replace CFI's work. See New Oxford American Dictionary 1480 (3d ed. 2010) (defining "replace" as "take the place of," "provide or find a substitute for (something that is broken, old, or inoperative)," and "fill the role of (someone or something) with a substitute"). Put simply, if a dictionary was turned to the term "replace" there could not be a clearer example of replacement than the replacement/substitution/or place-taking of CFI's work with the work done by Wildland and Elk River. The fact that CFI's original work may not have existed at the time of its replacement is irrelevant.
The Court also rejects CFI's argument that damages were awarded solely to restore the Weminuche Creek to stability or for damages to real property. (See ECF No. 77 at 13-18.) The fact that Rosgen may have testified that damage was done to Weminuche Creek by CFI's work is all well and good, but there is absolutely no evidence in the record that, that is the measure by which the arbitrators awarded damages to Heirloom. As discussed supra , the evidence is completely to the contrary, given that the spreadsheet reflects that the arbitrators took Heirloom up on its alternative request for damages-the cost to repair CFI's work. The fact that, in repairing CFI's work, Heirloom may also have repaired the Weminuche Creek, apart from belying CFI's argument that Heirloom did not repair CFI's work, does not mean that the arbitrators awarded Heirloom damages for injury done to real property. As Rockhill contends, there is simply no mention in the Final Hearing Brief of the real property's value prior to and after CFI's work. (See ECF No. 99 at 7.) Thus, it is hard to comprehend how the arbitrators could have measured damages based upon a calculation with which they were not provided numbers. Moreover, the Final Hearing Brief is clear that Heirloom had been left with a "complete redo" of design and build, which was the "key" to the arbitration. (See ECF No. 78-4 at 11.) As such, the Court reiterates that Heirloom was awarded damages to completely redo or repair CFI's work, whether this repair work involved repairing the Weminuche Creek is irrelevant to the Court's analysis herein.
The next question is why was Heirloom awarded these damages? That is more difficult, as the Final Award of the Arbitrators is a non-reasoned award. In other words, the arbitrators provided no reason for the damages they awarded, leaving why somewhat up to the imagination. Fortunately, the record from the arbitration proceeding does not leave the question completely open to imagination. Notably, as discussed supra , in its Arbitration Demand, Heirloom requested damages for breach of contract and negligence. Moreover, although Heirloom's Final Hearing Brief does not dwell on these terms, the arguments made therein sound both in breach of contract and negligence. (See ECF No. 78-4 at 6-10 (describing CFI as, inter alia , failing to do what they had contracted to do and deficiently designing and executing its work).) As such, the Court assumes that the arbitrators based their final decision on both theories-breach of contract and negligence. Cf. Automax Hyundai South, LLC v. Zurich Am. Ins. Co. , 720 F.3d 798, 807 (10th Cir. 2013) (explaining that, when a jury verdict failed to apportion damages between covered and uncovered claims, a court must *1118 conclude that covered conduct formed part of the basis for the jury verdict).[7]
It is also important to observe that the Final Award of the Arbitrators does not apportion between whether Heirloom incurred damages due to CFI's faulty design or its implementation (i.e., construction) of that design. As with the breach of contract/negligence issue discussed supra , Heirloom's Final Hearing Brief laid the blame for its predicament at the foot of both CFI's design and its construction. (See ECF No. 78-4 at 10 ("CFI's work was so deficient in design and execution, that it couldn't be repaired without starting over.").) As a result, the Court assumes that the arbitrators awarded Heirloom damages for both CFI's faulty design and its construction work.
In summary, the Court finds that Heirloom was awarded damages in the underlying arbitration for the cost of repairing or re-doing CFI's work. The reason for this was because CFI breached the Fisheries Contract and acted negligently in designing and implementing its work.
B. Whether the Damages Awarded to Heirloom are Damages Covered by the Professional Liability Policy Between Rockhill and CFI?
This issue is easier to resolve. The primary reason for this is that Rockhill puts up only one argument, relating to only one portion of the awarded damages, for why the damages awarded to Heirloom are not covered by the professional liability policy. The remainder of Rockhill's arguments relate to various exclusions in the policy. Obviously, if a claim was not covered in the first place, then there would be no need to consider an exclusion. Therefore, the Court considers Rockhill as implicitly conceding that any damages with which it only presents an exclusion-argument as being covered by the policy.
Rockhill's sole argument with respect to whether the damages awarded to Heirloom are covered by the professional liability policy is as follows. Rockhill argues that $23,000 of the damages awarded Heirloom constituted a "refund" of moneys or a "return of payment" that CFI had received from Heirloom to stabilize a stream bank. (ECF No. 80 at 14.) Rockhill argues that this amount falls outside the definition of "damages" under the professional liability policy because the policy defines "damages" as excluding returns of payment. (Id. at 11, 14.)
Although Rockhill's recitation of the "damages" definition from the professional liability policy is accurate, the Court disagrees with its characterization of the $23,000. As discussed supra , the Court found that Heirloom was awarded damages to repair or redo CFI's work. Therefore, the Court finds that Heirloom was not awarded damages in the form of a refund or return of payment for services CFI had already rendered. It is important to observe that Rockhill made precisely the same argument-that Heirloom was awarded damages to repair CFI's work-in its motion for summary judgment. (See ECF No. 80 at 15.) In other words, Rockhill cannot have it both ways.
*1119 The Court understands why Rockhill believes that it can. In the spreadsheet, the first invoice line item is an invoice from CFI in the amount of $23,000. (ECF No. 78-12 at 4.) One interpretation of that line item could be that CFI is being asked to refund Heirloom $23,000. However, that seems odd, given that Heirloom is being awarded more than $600,000 in damages, and all of that money will have to come from CFI (or its insurer). In other words, why make CFI refund $23,000 when they are being ordered to turn over far more than that anyway? Another, more plausible, interpretation of the line item is that the arbitrators simply used the CFI invoice in calculating how much it had cost Heirloom to repair CFI's work, especially given that Heirloom asked for damages in the form of the cost of repairs. Why the arbitrators used that invoice, the Court cannot say, the Final Award is, after all, non-reasoned. Perhaps it was because Heirloom mentioned in its Final Hearing Brief that about $5,700 worth of boulders had been used in Rosgen's reconstruction (see ECF No. 78-4 at 10 n.2), and the CFI invoice of $23,000 was for lining a river bank with rocks. Although those numbers obviously do not add up, the Court is not going to try and piece together the reasoning of the arbitrators at this stage; it is too late for that. All the Court can say is that Heirloom was awarded damages to repair or redo CFI's work, and the CFI invoice of $23,000 (along with all the other invoices) was part of that award.
Arguably, in its reply, Rockhill may raise another argument directed toward coverage. In reply, Rockhill contends that the professional liability policy insures only third party damage, "not the economic costs of completing contractual obligations," and this is reflected in the policy only providing coverage for a "professional services incident." (ECF No. 110 at 5-6.) The Court disagrees with Rockhill's argument, to the extent properly raised for the first time in reply, that the definition of "professional services incident" provides no coverage for the damages Heirloom was awarded in the arbitration.
"Professional services incident" is defined in the professional liability policy as "any negligent act, error or omission" "[i]n your rendering, or failing to render, 'professional services'; and [t]hat results in injury or damage." (ECF No. 78-1 at 77.) Rockhill argues that the policy's reference to "injury or damage" can only mean third party injury or damage. (ECF No. 110 at 5-6 & n.2.) The Court does not understand why. The definition clearly does not say that. The definition simply says "injury or damage." Why that injury or damage must happen to a third party is unknown. If Rockhill had wanted the definition to only cover third party injury or damage, then there would have been a simple fix: simply add in the words "third" and "party" prior to "injury," and then things would be in an entirely different position. Instead, the definition has no such refining language prior to injury or damage, and thus, the Court gives the language its natural meaning-any injury or damage. This, therefore, includes the damage Heirloom suffered in CFI not doing its work. The fact that CFI's work may have been required by the Fisheries Contract is entirely irrelevant as to whether Heirloom suffered any injury or damage. Noticeably, Rockhill cites no support to suggest otherwise. (See ECF No. 100 at 6.) It is simply absurd to suggest that Heirloom has suffered no injury or damage due to CFI not doing its work-the Final Award of the Arbitrators makes that evident.
In summary, because (1) the professional liability policy's definition of "damages" does not exclude costs to repair or redo CFI's work (see ECF No. 78-1 at 76), (2) the damages awarded to Heirloom are damages because of a claim resulting from *1120 a "professional services incident," and (3) Rockhill does not raise any other argument with respect to why the damages awarded to Heirloom should not be considered covered under the terms of the policy, the Court finds that the entirety of the damages awarded to Heirloom are covered under the policy.[8]
C. Whether an Exclusion in the Professional Liability Policy Excludes the Damages Awarded to Heirloom from Coverage?
Across the parties' motions for summary judgment, the following exclusions from the professional liability policy are addressed: (1) Exclusion I for "Geotechnical Engineering, Testing of Construction Materials and Other Services" ("Exclusion I"); (2) Exclusion M for "Faulty Workmanship" ("Exclusion M"); and (3) Exclusion P for "Expressed or Implied Warranties" ("Exclusion P"). The Court will address the arguments related to each exclusion in turn.
Before doing so, the Court observes that, in Colorado, "[t]o obtain the benefit of an exclusion, an insurer must establish that the exclusion applies and is not subject to any other reasonable interpretation." Leprino Foods Co. v. Factory Mut. Ins. Co. , 453 F.3d 1281, 1287 (10th Cir. 2006). In addition, in Colorado, "[w]hen construing the terms of insurance policies, [a court] appl[ies] principles of contract interpretation. As when interpreting contracts, [a court] attempt[s] to carry out the parties' intent and reasonable expectations when they drafted the policies." Cotter Corp. v. Am. Empire Surplus Lines Ins. Co. , 90 P.3d 814, 819 (Colo. 2004) (citations omitted).
1. Exclusion I
Both CFI and Heirloom seek summary judgment with respect to Exclusion I; Rockhill does not. (ECF No. 77 at 9-11; ECF No. 84 at 14-16; ECF No. 80 at 2 n.1.) CFI and Heirloom argue that Rockhill is unable to show that Exclusion I applies to this case. (ECF No. 77 at 10; ECF No. 84 at 14.) CFI asserts that any argument that CFI's work equated to slope stability engineering cannot be taken seriously. (ECF No. 77 at 10.) In response, Rockhill argues that Exclusion I applies to claims arising from foundation engineering, design, soil compaction, and soil assessment. (ECF No. 103 at 17.) Rockhill argues that, at a minimum, CFI's work involved slope stability and soil compaction. (Id. at 17-18.)
The Court rejects Rockhill's contention that disputed issues of fact exist as to whether Exclusion I applies. The main reason is that Rockhill simply presents no evidence that CFI engaged in any activity that would implicate Exclusion I. Rockhill argues that Exclusion I applies to foundation engineering, design, soil compaction, and soil assessment, and then relies upon slope stability and soil compaction. (See id. ) The first problem is that none of those terms are defined in the professional liability policy. (See ECF No. 78-1 at 76-77.) Moreover, Rockhill makes no attempt to provide definitions in its responses. (See ECF No. 99 at 19-21; ECF No. 103 at 17-19.) The Court will not do this work for Rockhill.
The next problem is that the only evidence Rockhill cites to support its contention that this case involves slope stability and soil compaction is correspondence between Heirloom and CFI, which purportedly stated that bank erosion had occurred *1121 due to CFI's work and that bank stabilization performed by CFI had failed. (ECF No. 99 at 19; ECF No. 103 at 17-18.) How that evidence shows that this case involves slope stability and soil compaction is not explained. Instead, Rockhill simply asserts that claims arising from the instability of a river bank's slopes and failed compaction of soil are excluded by Exclusion I. (ECF No. 103 at 18.)[9] Noticeably, no expert testimony is presented to establish Rockhill's argument that Exclusion I is implicated, which would seem to be necessary given the, presumably, technical nature of an exclusion that is so premised upon engineering and studies. Instead, when Rockhill asserts that this case potentially involves foundation engineering and soil compaction, it is effectively asking the Court to accept this assertion at the ipse dixit of Rockhill's lawyers. The Court will not be doing that.
Put simply, Rockhill has provided no evidence of what the services listed in Exclusion I mean, and, even if it had, no evidence how CFI's work involved any of those services. As a result, the Court finds that there is no issue of material fact with respect to the applicability of Exclusion I, and finds Heirloom and CFI entitled to summary judgment with respect to the same.
2. Exclusion M
The parties save their greatest battle for the applicability of Exclusion M to this case. Exclusion M provides that insurance does not apply to:
Faulty Workmanship
Based upon, arising out of or for any loss, cost or expense incurred to withdraw, recall, inspect, repair, replace, adjust, remove or dispose of 'your work'. This includes, but is not limited to, the cost to investigate 'your work', or the cost of any materials, parts, labor or equipment furnished in connection with such withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal.
(ECF No. 78-1 at 72.) "Your work" is defined as meaning: "[w]ork or operations performed by you or on your behalf; and" "[m]aterials, parts or equipment furnished in connection with such work or operations." (Id. at 77.) The definition includes: "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work' and" "[t]he providing of or failure to provide warnings or instructions." (Id. )
To cut a long story short, the parties wage battle over (1) whether Heirloom repaired or replaced CFI's work, and (2) whether CFI was engaged in "your work." The first issue is straightforward in light of the Court's findings supra. Namely, that Heirloom was awarded damages to redo or repair CFI's work. In other words, for purposes of Exclusion M, the Court finds that Heirloom's damages were based upon a loss, cost, or expense incurred to repair or replace CFI's work.
The far more difficult question is whether CFI's work is "your work" for purposes of the professional liability policy. As an initial matter, as discussed supra , the Court found that Heirloom was awarded damages due to CFI's faulty design and construction. In other words, CFI's work, here, was design and construction. To what extent it was design and what extent construction, the Court cannot say because the Final Award of the Arbitrators was non-reasoned. To the extent one is included in the definition of "your work" and one *1122 is not, the Court will simply have to assume that the entire amount of the damages awarded to Heirloom is not included in the definition of "your work," and is thus, not excluded by Exclusion M. Cf. Automax , 720 F.3d at 807.
The parties' principal fight is over whether Exclusion M includes both design and construction work or just construction work. Heirloom and CFI take the latter position (ECF No. 77 at 12-15; ECF No. 84 at 16-18), while Rockhill takes the former position (ECF No. 110 at 8-9). Based upon the Court's review of the entire record and applicable case law and secondary sources, there are a number of problems faced with attempting to resolve this dispute. In no particular order, the Court will attempt to address each.
First, not one of the cases to which the parties cite is precisely on point with the facts of this case. Put another way, all of the cases to which the parties cite suffer from factual differences that make them not particularly persuasive. Uniformly, the cases to which Heirloom and CFI cite suffer from one notable factual problem-none of them involve a professional liability policy that includes an exclusion such as Exclusion M or an exclusion such as Exclusion M that includes a term like the "your work" term.[10] As for Rockhill, except in one instance, every single case to which it cites involves either a commercial general liability policy or an all risk policy. As we will learn, a commercial general liability policy is not the same as a professional liability policy.[11] In the end, though, Rockhill gets the closest to the facts of this case in citing to Harris Thermal Transfer Products, Inc. v. James River Ins. Co. , 457 Fed.Appx. 660 (9th Cir. 2011) (unpublished) (" Harris Thermal II "). In Harris Thermal II , a professional liability policy was in dispute and the Ninth Circuit concluded that the insured's design work fell within an exclusion in the policy. Of all the cases cited, this is the only one in which design work was found to be excluded from a professional liability policy. But there is a very good reason for that. The professional liability policy in Harris Thermal II expressly excluded design work from coverage. See Harris Thermal Transfer Products, Inc. v. James River Ins. Co. , 2010 WL 2942611, at *8 (D. Or. July 19, 2010). There is no express exclusion of design work in Exclusion M. Therefore, the Court does not find Harris Thermal II to be helpful either.
Second, the language of the "your work" definition and Exclusion M is unambiguous. The most important piece of language is the "your work" definition, as it frames Exclusion M. Given the amount of dispute between the parties that the definition has produced, "your work" is defined very simply. It means, inter alia : "[w]ork or operations *1123 performed by you or on your behalf." "Work" is obviously an important word in that definition. The dictionary defines "work" as meaning an "activity involving mental or physical effort done in order to achieve a purpose or result." New Oxford American Dictionary 1990 (3d ed. 2010). As important is the word "performed." The dictionary defines "perform" as "carry out, accomplish, or fulfill (an action, task, or function)." Id. at 1302. The final important word is "you." The professional liability policy defines "you" as CFI. (ECF No. 78-1 at 2, 70.) It is also important to note from the definition that there are no qualifiers or restrictions on the word "work." As a result, the only natural reading of the definition is that it encompasses ALL work. In other words, "your work" means any activity involving mental or physical effort to achieve a purpose or result that is carried out by CFI. Based purely on a natural reading of the definition, therefore, it should include design work. Notably, the dictionary defines "design" as "a plan or drawing produced to show the look and function or workings of a building, garment, or other object before it is built or made." New Oxford American Dictionary 471 (3d ed. 2010). As far as the Court is concerned, it cannot be disputed then that design involves, at the very least, mental effort to achieve a purpose. Moreover, here, it is undisputed that CFI did the design work. Ordinarily, this clarity to the language would be a good thing in terms of resolving a dispute. See Weitz Co., LLC v. Mid-Century Ins. Co. , 181 P.3d 309, 312 (Colo. App. 2007) ("Courts should not rewrite clear and unambiguous contract provisions."). As discussed infra , though, this clear contract language collides with the generally understood purpose of professional liability policies.
Third, if one thing has been made clear to the Court in its review of secondary sources related to insurance contracts in the construction and design fields it is that commercial general liability ("CGL") policies are meant to be very different from professional liability policies. A person does not have to read relevant secondary sources for long to quickly understand this. As Heirloom and CFI correctly point out, even one of the treatises Rockhill previously cited makes this distinction. (See ECF No. 77 at 13, ECF No. 84 at 18 (citing Robert F. Cushman & Michael C. Loulakis, Design-Build Contracting Handbook § 8.08[A] (2d ed. 2001) ).) Rockhill does not attempt to explain why the Court should not consider this treatise relevant, instead it relies on cases, which, as discussed supra , are not particularly relevant. (See ECF No. 99 at 15; ECF No. 103 at 11-12.) The treatise is relevant though. It says that professional liability policies, unlike CGL policies, will cover losses to redesign elements negligently designed and to reconstruct elements defectively designed. Cushman & Loulakis, supra , at § 8.08[A]. There are more than enough other secondary sources that say very similar things. Some of the most interesting are the ones that discuss exclusions in CGL policies. For example, the Construction Law Manual explicitly states that:
A CGL policy is not a professional liability policy. To make this point clear CGL policies specifically exclude any claims for professional liability resulting from design services. If a contractor is going to furnish design services (perhaps including shop drawings), then this risk should be looked at for specific coverage by rider or separate professional liability policy.
Larry R. Leiby, Construction Law Manual § 20:9 (2017-2018 ed.). This is precisely what happened here. CFI's CGL policy specifically excluded from coverage professional services, including engineering, architectural, surveying, or related services, and testing, consulting, or related services. (ECF No. 78-1 at 40.) So, presumably, *1124 CFI looked for specific coverage through a separate professional liability policy.
Another secondary source says much the same thing. The American College of Construction Lawyers Journal has stated that:
The general liability policy, as the name implies, is not intended to cover specialized risks arising out of the provision of professional services. Professional risks are covered by professional liability insurance. Professional liability insurance, a form of 'errors and omissions' coverage, is written through policies that are structured much differently than the CGL policy.
. . .
[A professional services] exclusion is often added by way of a restrictive endorsement to the CGL policies of insureds who regularly perform professional services. The intent of the exclusion is to carve out professional risk that is subject to transfer to an insurer under a professional liability policy.
Patrick J. O'Connor, Jr., Understanding General Liability Coverage: A Primer for Construction Lawyers , 2 No. 2 Am. Coll. Constr. Lawyers J. 3 (2008).
Ultimately, the Court is convinced, based upon its review of all of the cases and secondary sources it has seen independently and those presented in the parties' pleadings, that the purpose of professional liability policies is to cover errors and omissions in an insureds provision of professional services. See N. Am. Treatment Sys., Inc. v. Scottsdale Ins. Co. , 943 So.2d 429, 446 (La. Ct. App. 2006) ("Coverage for professional liability is usually excluded under CGL or other commercial liability policies, being usually provided under special policies, which, depending upon the profession or business, may be referred to as malpractice, errors and omission (E & O), or professional liability policies."). The Court is further convinced that, in Heirloom having to repair or redo CFI's work, CFI committed errors and/or omissions in providing its design services. Put simply, the Court is convinced that, ordinarily , the damages awarded to Heirloom in the arbitration should be covered by a professional liability policy. In case it was not clear, though, this is not an ordinary case.
Fourth, although "professional services" is defined in the professional liability policy, it is only done so in a round about way. "Professional services" is defined, in part, as "those services stated in the Declarations as Professional Services." (ECF No. 78-1 at 76.)[12] In the Declarations, the only mention of professional services is "Covered Professional Services," which appears to suggest it means " 'Professional Services' performed by the named insured for others for a fee." (Id. at 2.) In other words, it appears that "professional services" means "professional services," which, of course, is not very helpful. Fortunately, this is not the first occasion that "professional services" has not been adequately defined.
*1125 In Zurich Am. Ins. Co. v. O'Hara Reg'l Ctr. for Rehab. , 529 F.3d 916, 924 (10th Cir. 2008), the Tenth Circuit Court of Appeals explained that the "most frequently relied" upon definition of professional services is: "A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominately mental or intellectual, rather than physical or manual." (citation omitted).
With this definition as its guide, the Court has little problem in finding design to be a professional service, which, it appears, none of the parties dispute. See Wisznia Co., Inc. v. Gen. Star Indem. Co. , 759 F.3d 446, 447, 450-451, 453 (5th Cir. 2014) (concluding that the allegations in a petition unambiguously excluded coverage under a general liability policy with a professional liability exclusion, when the petition alleged that a party hired a company to use its professional skills to design a building and coordinate its construction, and the building failed to pass muster); (ECF No. 78-4 at 6-10 (alleging that Heirloom relied on CFI's expertise, CFI failed to collect data that was important for a "fish habitat enhancement professional," an understanding of hydraulic properties was needed, and Heirloom hired a world renowned expert in river enhancement to produce a new design).)
Fifth, all of the foregoing leads the Court to conclude that the professional liability policy should not contain an exclusion such as Exclusion M that excludes from coverage professional services like design work. There is simply no way to reconcile the purpose of professional liability policies, which is to provide insurance coverage for errors and omissions in a professional's work, with the clear meaning of Exclusion M, which is to exclude from coverage, inter alia , any claims based upon the repair and replacement of CFI's professional work. It is for this reason that it is perhaps not surprising that not one of the parties, or this Court, have been able to find a case (or even a secondary source) mentioning a professional liability policy that has an exclusion or endorsement with a "your work " definition as broad as the one here.[13] The Court can only presume that the reason there is no such case or secondary source is because no such definition exists in a professional liability policy. Until now.
Finally, in light of all of the foregoing, the Court finds itself placed between two hard rocks. In the end, one must give way. Which it is requires resort to principles of contract interpretation under Colorado law. On one side is the instruction that courts should not rewrite clear and unambiguous contract provisions. See Weitz , 181 P.3d at 312. On the other side is the instruction that, in interpreting contracts, a court should attempt to carry out the parties' intent and reasonable expectations when the policy was drafted. See Cotter Corp. v. Am. Empire Surplus Lines Ins. Co. , 90 P.3d at 819. The Court has little problem in believing that a reasonable expectation of a professional liability policy is that it would insure professional services such as design work, especially when, as *1126 here, the Declarations page states that "Covered Professional Services" are professional services performed by CFI. (See ECF No. 78-1 at 2.)
The Colorado Supreme Court has explained that "[t]he primary goal of contract interpretation is to determine and give effect to the intent of the parties. The intent of the parties to a contract is to be determined primarily from the language of the instrument itself." Ad Two, Inc. v. City & Cnty. of Denver , 9 P.3d 373, 376 (Colo. 2000) (citations omitted). The Colorado Supreme Court further explained that "[w]ritten contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language." Id. Here, the Court has found the language of Exclusion M and the definition of "your work" to be unambiguous. In other words, the Court does not find that language to be susceptible to more than one reasonable interpretation. See id. There is simply no way to interpret the unqualified word "work" in multiple fashions.[14] As a result, the intention of the parties here, irrespective of the ordinary purpose of professional liability policies, was to exclude damages arising from the replacement or repair of any work performed by CFI. See id. As discussed supra , this includes CFI's design work.
Heirloom and CFI argue that this cannot be so for two reasons. One, it would render the professional services exclusion in the CGL policy meaningless. (ECF No. 77 at 15; ECF No. 84 at 18 n.8.) The Court disagrees. The CGL policy contains the exact same definition of "your work" as the professional liability policy. (Compare ECF No. 78-1 at 29, with id. at 77.) Heirloom and CFI argue, therefore, that if "your work" includes design work in one policy, it must also mean it in the other. And, they argue, if that is the case, there would be no need for a professional services exclusion in the CGL policy because there is already an exclusion in that policy containing the term "your work." Heirloom and CFI, though, ignore that the exclusion containing "your work" in the CGL policy is worded differently to Exclusion M. The relevant exclusion in the CGL policy excludes "[p]roperty damage" to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (Id. at 18-19.) In this light, unlike Exclusion M, the term "your work" is restricted by the fact that "your work" must be performed on property . As discussed supra , "design" means "a plan or drawing produced to show the look and function or workings of a building, garment, or other object before it is built or made." New Oxford American Dictionary 471 (3d ed. 2010). In other words, no part of design work involves performing an activity on property . Instead, in the context of this case, it entails producing a plan or drawing that will show how a property may look and/or function before any work is performed on it. As such, design work would *1127 not be encompassed by the relevant exclusion in the CGL policy; hence the need for the professional services exclusion.[15]
Two, Heirloom and CFI argue that the professional liability policy would be rendered illusory if professional services were excluded from coverage. (ECF No. 77 at 4; ECF No. 84 at 17 n.6.) The Court agrees that its interpretation of the plain meaning of the professional liability policy does remove a swath of coverage that, as discussed, would normally be expected in such a policy. In fact, as explained supra , the Court's interpretation of the policy would defeat what appears to be one of the purposes of a professional liability policy. But, the interpretation does not render the policy illusory, as it still provides some coverage. Any claim that is not based upon the withdrawal, recall, inspection, repair, replacement, adjustment, removal, or disposal of CFI's work would still be covered. Thus, for example, as Rockhill suggests, this would mean that claims would be covered that were brought by third parties for damage to their property caused by CFI's work. (See ECF No. 99 at 9.) Although, supra , the Court found Rockhill's attempt to restrict the term "injury or damage" to merely third party injury or damage to be absurd, that was with respect to coverage. If a contracting party wishes to agree to a contract that deals away its coverage in the form of a broad phrase such as "your work," then the Court cannot save that party from having done so. The Court simply cannot rewrite clear contracts. See Weitz , 181 P.3d at 312. The fact that the professional liability policy, in hindsight, may seem a bad deal is, ultimately, a problem of CFI's own making in failing to review and comprehend the policy before agreeing to it.[16]
In summary, in light of all of the discussion above with respect to Exclusion M, the Court finds that Exclusion M is unambiguous, and its unambiguous meaning is that damages arising from the replacement or repair of CFI's design or construction work, such as the damages here, are excluded under the plain terms of Exclusion M. As a result, the professional liability policy provides no coverage to CFI for the damages awarded to Heirloom in the arbitration proceeding. Therefore, Rockhill is entitled to summary judgment on this ground.
3. Exclusion P
For the sake of completeness, the Court will address the applicability of Exclusion P. In its motion for summary judgment, Rockhill argues that Exclusion P excludes coverage for satisfaction of CFI's warranties. (ECF No. 80 at 13-17.) In response, Heirloom and CFI argue, inter alia , that Rockhill has either waived Exclusion P as an affirmative defense or cannot use it as a basis for summary judgment. (ECF No. 97 at 12-13; ECF No. 105 at 16-17.) Heirloom and CFI also argue, alternatively, that Exclusion P does not apply. (ECF No. 97 at 13-14; ECF No. 105 at 18-20.)
*1128 The Court agrees with Heirloom and CFI that Exclusion P does not apply.[17] There is a simple reason: Rockhill fails to identify any specific warranty that CFI made to Heirloom that formed the basis of the damages awarded to Heirloom. Exclusion P excludes damages based upon "[a]ny expressed or implied warranties or guarantees, or" "[a]ny cost or other estimates for construction, renovation, removal or demolition being exceeded or inaccurate." (ECF No. 78-1 at 72.) Rockhill relies on only the first clause pertaining to warranties or guarantees, so the Court focuses solely upon that. (See ECF No. 80 at 13.) In relying upon the first clause of Exclusion P, though, Rockhill makes no attempt to either (a) explain what warranties or guarantees CFI has provided, or (b) even if it had pointed to a warranty or guaranty, explain why the damages awarded in the arbitration proceeding were based upon a warranty or guaranty. (See ECF No. 80 at 13-17.) Instead, Rockhill merely cites to some cases that have purportedly applied a similar exclusion before (id. at 13-14), asserts that Heirloom incurred $23,000 in costs for work included within CFI's unidentified warranty obligation (id. at 14-15), and then conclusorily asserts that over $500,000 in damages should be excluded under Exclusion P without ever explaining why (id. at 16-17). Rockhill also fails to identify any applicable warranty or guaranty in its reply. (See ECF No. 100 at 13-14.) The Court will not do Rockhill's explanation and analysis work for it.[18] In any event, even if Rockhill had somehow more fully argued its case, the Court would disagree with any argument that had been made because the Court has already determined that the damages awarded to heirloom were awarded for Heirloom to repair, redo, or replace CFI's work. At no point did the Court find, nor did Rockhill argue in relation thereto, that those damages were also awarded due to a warranty obligation or that the replacement of CFI's work was due to a warranty obligation. As the Court has stated before, Rockhill cannot have things both ways.
As a result, the Court finds that Rockhill is not entitled to summary judgment with respect to Exclusion P.
*1129 D. Whether Attorney Fees and Costs Awarded in the Arbitration are Covered Under the Professional Liability Policy?
Rockhill argues that attorney fees and costs awarded to Heirloom in the arbitration proceeding are not covered under the professional liability policy because the policy only covers costs if they were taxed in a suit alleging damages to which the policy applies. (ECF No. 80 at 17-18.) Rockhill argues that, because the policy does not cover the damages awarded to Heirloom, costs are also, thus, not covered. (Id. ) CFI argues that damages are covered under the policy, and thus, Rockhill's argument should be rejected. (ECF No. 97 at 16.) Apart from making that argument, Heirloom also argues that damages need only be claimed or alleged in a suit for costs to be covered under the policy. (ECF No. 105 at 21-22.)
Obviously, because the Court has found that the damages awarded to Heirloom are excluded from coverage by the professional liability policy, the Court rejects CFI and Heirloom's argument that costs must also be covered. That leaves Heirloom's alternative argument over the language of the policy. Both Rockhill and Heirloom start with the language of the defined term "claim expenses." "Claim expenses" are defined as including costs, if incurred by CFI with Rockhill's written consent, that are "taxed against the insured in the 'suit.' " (ECF No. 78-1 at 76.) Both Rockhill and Heirloom then look to the definition of "suit." "Suit" is defined as "a civil proceeding in which 'damages' because of any act, error or omission to which this insurance applies are alleged." (Id. at 77.) "Suit" is further defined as including "[a]n arbitration proceeding in which such 'damages' are claimed and to which the 'insured' must submit or does submit with [Rockhill's] consent." (Id. )
The Court simply does not read that language in the same way as Heirloom, and thus, rejects its argument that attorney fees and costs are covered under the professional liability policy. Heirloom appears to read the language "alleged" and "claimed" as acting upon the language "any act, error or omission to which this insurance applies...." (See ECF No. 105 at 21.) The Court does not agree. Instead, the Court believes that the words "alleged" and "claimed" are only acting upon the word "damages." This means that "damages" in the "suit" or arbitration need only be alleged or claimed. But, the insurance must actually apply to any act, error, or omission; simply alleging that the insurance applies is not enough. The Court acknowledges that the arbitration clause (of the definition of "suit") is more appealing for Heirloom's position, but, the Court still reaches the same finding. In the arbitration clause, it reads "in which such 'damages' are claimed...." "[S]uch 'damages,' " though, are still " 'damages' because of any act, error or omission to which this insurance applies...." As such, the word "claimed" is still only acting upon "damages," rather than insurance being applicable. Therefore, although the language in the arbitration clause is not artful, it does not change the Court's thinking.
In addition, in effect, Heirloom's argument-that damages need only be alleged or claimed in a suit or arbitration proceeding-would always result in attorney fees and costs being covered by an insurance policy with this language, even if the underlying damages later proved to be excluded or not covered. As far as the Court is concerned, this would turn the duty to indemnify into a duty to defend. See Cyprus Amax , 74 P.3d at 301 ("In the duty to defend context, the 'complaint rule' operates to cast a broad net, such that when the underlying complaint alleges any facts *1130 or claims that might fall within the ambit of the policy, the insurer must tender a defense.") (emphasis in original). And that is not so under Colorado law. See id. ("The duty to indemnify arises only when the policy actually covers the harm and typically cannot be determined until the resolution of the underlying claims.").
Ultimately, because the issue of attorney fees and costs is an issue of coverage , rather than exclusion, the burden is on Heirloom and CFI to show that attorney fees and costs are covered. See Pitman v. Blue Cross & Blue Shield of Oklahoma , 217 F.3d 1291, 1298 (10th Cir. 2000) ("A basic rule of insurance law provides that the insured has the burden of showing that a covered loss has occurred, while the insurer has the burden of showing that a loss falls within an exclusionary clause of the policy."); James River Ins. Co. v. Rapid Funding, LLC , 2008 WL 5378143, at *4 (D. Colo. Dec. 23, 2008). Here, the Court finds that Heirloom and CFI have failed to meet that burden, and thus, Rockhill is entitled to summary judgment on the ground that attorney fees and costs awarded to Heirloom in the arbitration are not covered under the professional liability policy.
E. Are CFI's Bad Faith Claims Viable?
Rockhill moves for summary judgment with respect to CFI's bad faith claims, CFI does not. Rockhill argues that, for CFI to recover under its bad faith claims, there must be a duty to indemnify. (ECF No. 80 at 18.) CFI responds that it is entitled to coverage under the professional liability policy. (ECF No. 97 at 19.) Alternatively, CFI argues that Rockhill's bad faith is not limited to its refusal to provide indemnity. (Id. at 19-20.) CFI argues that Rockhill committed industry violations in handling CFI's defense, including failing to reasonably pursue settlement and improperly seeking recoupment of defense costs. (Id. at 20.) In reply, Rockhill argues that, when an arbitration award is not covered, there is no duty to fund a settlement. (ECF No. 110 at 15.)
The Court agrees with CFI to the extent that its bad faith claims are not rendered unviable simply because this Court has found that Rockhill has no duty to indemnify. All of the cases Rockhill cites in support of its contrary position are noticeably distinguishable. In particular, those cases found that there was no duty to indemnify and no duty to defend. See MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co. , 558 F.3d 1184, 1192-93 (10th Cir. 2009) ;[19] Prospect Res., Inc. v. St. Paul Fire & Marine Ins. Co. , 2012 WL 263394, at *7 (D. Colo. Jan. 30, 2012).[20] In reply, Rockhill also cites, in a footnote, Lira v. Shelter Ins. Co. , 913 P.2d 514 (Colo. 1996), to support its proposition that, if an award is not covered, then there is no duty to fund a settlement. (ECF No. 110 at 15.) However, that case involved an insurer's failure to settle its insured's exposure to punitive damages when the insurance policy "expressly precluded" coverage for punitive damages.
*1131 Lira , 913 P.2d at 517. The Colorado Supreme Court found there was no such duty. The Colorado Supreme Court noticeably observed that such a result comported with public policy concerning punitive damages, which prohibits an insurance carrier from providing insurance coverage for such damages. Id. This case does not involve punitive damages, and thus, the Court does not find Lira applicable.
Turning to the substance of CFI's bad faith claims, Rockhill also argues that CFI has failed to provide any evidence of alleged lost business income due to Rockhill's conduct. (ECF No. 80 at 19-20.) In response, CFI argues that Rockhill's conduct "destroyed" its business, which purportedly went from annual sales exceeding a million dollars during 2007 through 2016 to no customers in 2017. (ECF No. 97 at 21-22.)
Even if the Court was willing to find that CFI has produced some evidence of its business income and valuation, the Court cannot find-because CFI has presented no evidence-that any lost income or value was caused by Rockhill's failure to settle.
An insurer's bad faith breach of an insurance contract can give rise to tort liability. Nunn v. Mid-Century Ins. Co. , 244 P.3d 116, 119 (Colo. 2010). To establish liability in tort, a party must show "the existence of a duty, a breach of that duty, causation, and damages." Redden v. SCI Colorado Funeral Services, Inc. , 38 P.3d 75, 80 (Colo. 2001). "For an insurer to prevail on a bad faith claim against an insurer, the insured must establish the insurer acted unreasonably, causing damages to the insured." Bankruptcy Estate of Morris v. COPIC Ins. Co. , 192 P.3d 519, 523 (Colo. App. 2008). Finally, "[a]lthough the determination of proximate cause is a question of fact for the jury when based on conflicting evidence, when there is no conflicting evidence, it is a matter of law for the court." Lego v. Schmidt , 805 P.2d 1119, 1124 (Colo. App. 1990) (citation omitted).
Here, the only fact upon which CFI appears to rely is one of timing. More specifically, CFI argues that the "consistency" to its business "ended abruptly after 2016, contemporaneous with the arbitration and Rockhill's bad faith failure to settle or pay." (ECF No. 97 at 21.) In other words, because Rockhill should have been settling the arbitration sometime in 2016 and CFI's business ended in 2016, those two events must be connected. But, there is no evidence to support such a speculative contention. Moreover, although CFI appears to rely upon the timing of events, it fails to provide an actual timeline other than stating that its business stopped after 2016 and Rockhill's conduct occurred in early 2016. Thus, even if the Court was willing to put aside the complete lack of evidence to support CFI's arguments, such broad swathes of time cannot be the basis of a causation argument.
CFI also argues that it was unable to service clients in 2016 due to Rockhill's conduct. (Id. ) CFI cites two factual statements in support. Neither statement supports that CFI was unable to service clients in 2016 due to Rockhill's conduct, or that CFI's business was destroyed by Rockhill's conduct. In the first (statement 48), CFI simply regurgitates its response to an interrogatory. (See ECF No. 101 at ¶ 48.) It is true that the interrogatory response, much like CFI's response to Rockhill's motion for summary judgment, baldly asserts that Rockhill caused CFI to stop business. But, no evidence is cited in support. The only evidence cited in the statement is CFI's mention of its gross sales and shareholder earnings. In the second (statement 49), CFI, inter alia , queries Rockhill's reliance on an affidavit of a former *1132 CFI customer. (Id. at ¶ 49.) Whatever that affidavit may or may not show, it certainly does not show that Rockhill caused the destruction of CFI's business. CFI next cites evidence purportedly showing that all of CFI's customers stopped calling by 2017. Again, that runs to CFI's contention that the timing of its customer loss must mean that Rockhill caused its injuries. That is simply speculation. CFI also cites testimony that purportedly shows that Rockhill relied upon referrals for business. Assuming that is true, it does not mean that those referrals dried up because of Rockhill. In other words, the only evidence CFI relies upon is speculation. And that is simply not enough to sustain CFI's burden with respect to causation. See Widefield Homes, Inc. v. Griego , 160 Colo. 225, 416 P.2d 365, 366 (1966) ("That the raised grate was the proximate cause of Victor's fall was, under this record, only mere possibility and speculation and such cannot be the basis for a jury verdict.").[21]
As a result, the Court finds that Rockhill is entitled to summary judgment with respect to CFI's bad faith claims.[22]
F. Remaining Issues
As mentioned, although the five issues discussed supra were, from the Court's perspective, the five principal issues in this case, there are other issues that must now be resolved. In light of the Court's findings herein, the remaining issues are fairly straightforward.
First, Rockhill's motion to strike CFI's response (ECF No. 109) is DENIED.
Second, Rockhill's motion to strike defendants' jury demand (ECF No. 124) is DENIED AS MOOT.[23] ,[24]
Third, CFI's motion to compel production. (ECF No. 75.) The Court acknowledges that the motion to compel production was referred to the U.S. Magistrate Judge, and the Magistrate Judge entered an Order granting it in part and denying it in part. (ECF Nos. 79, 131.) Nonetheless, in light of the Court's findings herein, the Court finds that the best approach is to VACATE the Order at ECF No. 131 and rescinds any obligations that may have been imposed on Rockhill under the Order. The reason is as follows. In the motion to compel production, CFI requested production *1133 of documents from Rockhill related to three requests for production. The Court has reviewed the relevant requests for production (ECF No. 75 at 5), and finds that no documents that may have been produced, if the Court had allowed the Order at ECF No. 131 to stand, would have assisted in the resolution of this case. Therefore, the motion to compel production is DENIED.
As CFI puts it, the three requests for production seek Rockhill's "explanation of the policy language that it relies upon to deny coverage." (Id. at 15.) The Court, though, has found the relevant language from the professional insurance policy to be clear and unambiguous. As a result, irrespective of what Rockhill's explanation of the policy may have been, the Court cannot rewrite the clear terms of the policy, even if Rockhill's explanation was different to the one clearly expressed in the policy's terms. See Weitz , 181 P.3d at 312. Put another way, because of the clarity of the policy's relevant terms, Rockhill and CFI's intent is expressed by those terms, not by either party's extraneous thoughts, explanations, or deposition testimony on the same. See Ad Two , 9 P.3d at 376.[25] Moreover, although the Magistrate Judge found that potential documents may have been relevant to CFI's bad faith claims, this appears to have been related to the policy language Rockhill relied upon to deny coverage. (See ECF No. 131 at 5-6.) That, however, is irrelevant to the Court's finding herein that CFI's bad faith claims are not viable because CFI failed to produce any evidence that its purported damages were caused by Rockhill's conduct.
III. Conclusion
In summary, herein, the Court has found:
(1) Heirloom was awarded damages in the underlying arbitration for the cost of repairing or re-doing CFI's work. Heirloom was awarded these damages because CFI breached the Fisheries Contract and acted negligently in designing and implementing its work.
(2) The entirety of the damages awarded to Heirloom (which means $629,671.97) are covered under the professional liability policy.
(3) Heirloom and CFI are entitled to summary judgment with respect to Exclusion I.
(4) Rockhill is not entitled to summary judgment with respect to Exclusion P.
(5) Exclusion M is unambiguous, and its unambiguous meaning is that damages arising from the replacement or repair of CFI's design or construction work, such as the damages specified in (2) above, are excluded under the plain terms of Exclusion M. As a result, the professional liability policy provides no coverage to CFI for the damages awarded to Heirloom in the arbitration proceeding that are specified in (2) above.
(6) Attorney fees and costs awarded to Heirloom in the arbitration proceeding are not covered under the professional liability policy.
(7) Rockhill is entitled to summary judgment with respect to CFI's bad faith claims.
Accordingly, for the reasons discussed herein, the Court:
(1) DENIES Heirloom's motion for oral argument (ECF No. 122);
*1134 (2) GRANTS IN PART and DENIES IN PART Rockhill's motion for summary judgment (ECF No. 80);
(3) GRANTS IN PART and DENIES IN PART CFI's motion for partial summary judgment (ECF No. 77);
(4) GRANTS IN PART and DENIES IN PART Heirloom's motion for summary judgment (ECF No. 84);
(5) VACATES the Order at ECF No. 131 in its entirety;
(6) DENIES CFI's motion to compel production (ECF No. 75);
(7) DENIES Rockhill's motion to strike CFI's response (ECF No. 109); and
(8) DENIES AS MOOT Rockhill's motion to strike defendants' jury demand (ECF No. 124).
The January 4, 2018 Order setting this case for trial (ECF No. 120) is VACATED.
The Clerk is instructed to enter Final Judgment in favor of plaintiff Rockhill Insurance Company, and then CLOSE this case.
SO ORDERED.

From the get-go, Heirloom's motion for oral argument (ECF No. 122) is DENIED. The Court has reviewed the parties' pleadings and does not believe that oral argument is necessary.

The Court sets forth the relevant evidence and material facts in its discussion infra.

Rockhill also cites to interrogatory responses from the underlying arbitration. (ECF No. 78 at ¶ 18.) The Court does not find those interrogatory responses to be very useful. As one of the responses stated, the response was not intended to limit Heirloom's claims, which had been described in the Arbitration Demand. (See ECF No. 78-6 at 7.) The Court finds the Arbitration Demand, and other documents identified supra , to be more helpful in assessing the basis for Heirloom's claims.

Unless otherwise noted, with respect to all filings, the Court cites to the page number assigned by the CM/ECF system in the top-right hand corner of said pleading.

Because the Interim and Final Awards of the Arbitrators are, in substance, almost the same, except for the Final Awards provision of attorney's fees and costs, the Court cites only to the Final Award.

The Court notes that the amount awarded to Heirloom, without interest, in the Final Award of the Arbitrators is $609,994.91, while the amount stated in the spreadsheet for the total without interest is $609,928.23. (ECF No. 78-12 at 2, 4.) The total with interest, however, is the same in both the Final Award and the spreadsheet-$629,671.97. (Id. ) Whether there is anything to the 'without interest' discrepancy, the Court does not know. But, given that the parties do not appear to raise any arguments in this regard, the Court leaves the issue be.

The Court notes that the parties spend much time skirmishing over the claims Heirloom brought in the underlying arbitration and which claims formed the basis of the arbitrators' Final Award. (See, e.g. , ECF No. 97 at 6-7; ECF No. 105 at 6-7; ECF No. 110 at 5-8.) The Court does not believe it necessary to wade too deep into this debate, especially given that Rockhill states that it has not made an argument that the policy does not apply to breaches of contract. (See ECF No. 110 at 5.) For the Court, the principal question in this regard is whether the policy covers (or excludes) damages resulting from CFI's failure to do its work, i.e., costs Heirloom incurred for having to redo that work.

By "entirety," the Court means the $629,671.97 awarded to Heirloom as "damages on [its] claims" (see ECF No. 78-12 at 2), including interest. The Court will address the attorney fees and costs awarded to Heirloom separately herein.

Rockhill does much the same with its assertion that a document from "the Santa Clara Valley Water District" is relevant. (See ECF No. 103 at 18.) Presumably, the Court is meant to read through that document and just know that slope stability protection is necessary to avoid stream bank erosion.

It appears that Heirloom and CFI may believe that Am. Fam. Mut. Ins. Co. v. Teamcorp, Inc. , 659 F.Supp.2d 1115 (D. Colo. 2009), is their most persuasive case. (See ECF No. 77 at 14; ECF No. 105 at 14.) Whether or not that is so, the Court does not find it helpful here. Most notably, it involves a commercial general liability policy, not a professional liability policy. See Teamcorp , 659 F.Supp.2d at 1118. As we will learn, those are two very different beasts. In addition, although "your work" was defined in the same way as here, none of the exclusions at issue in Teamcorp were worded like Exclusion M. See id. at 1124-25. Finally, the wording of the exclusions in Teamcorp are notable because they relate to property and/or work incorrectly performed on property. See id. at 1124. There is no such wording in Exclusion M.

As for "all risk" policies, as the court in one of the cases Rockhill cites stated, negligent work exclusions in "all risk" policies do not insure the quality of an insured's contractual undertakings. See 242-44 East 77th St., LLC v. Greater N.Y. Mut. Ins. Co. , 31 A.D.3d 100, 105, 815 N.Y.S.2d 507 (N.Y. App. Div. 2006). As we will learn, that is not necessarily the purpose of professional liability policies.

Contrary to CFI's assertion, professional services are not defined solely as services performed in CFI's practice as a consultant. (See ECF No. 113 at 9.) In full, "professional services" are defined as: "those services stated in the Declarations as Professional Services; A. That are performed by or for you in your practice as a consultant, engineer, architect, surveyor or testing laboratory; B. For which you, or any person performing such services for you, are licenses where required by law; and C. That are part of your usual and customary services." (ECF No. 78-1 at 76.) In other words, before even considering whether the professional services were performed in CFI's practice as a consultant, the Court must decide what services are stated in the Declarations as "Professional Services."

Although the Court could cite various sources, the Court chooses as one representative example the secondary source cited by the Tenth Circuit in O'Hara . In O'Hara , the Tenth Circuit relied upon Appleman on Insurance (2d ed. 2003). O'Hara Reg'l Ctr. , 529 F.3d at 924. Appleman provides a list of 17 exclusions that are the "most common" in professional liability policies. 23 Appleman on Insurance § 146.6[R] (2d ed. 2003). Not one of those 17 common exclusions is a "Faulty Workmanship" exclusion such as Exclusion M. Although Appleman states that there may be other exclusions, the examples it gives are ones particular to a specific profession. It cannot be said, though, that Exclusion M is an exclusion particular to the design profession, rather, it appears that it could apply to any profession.

Arguably, Exclusion M could be viewed as ambiguous. The language of the exclusion is underneath the heading "Faulty Workmanship." (ECF No. 78-1 at 72.) Heirloom and CFI argue that "faulty workmanship" is not meant to encompass professional services. (ECF No. 77 at 12-13; ECF No. 84 at 16, 18.) If that is the case, arguably, an interpretation of "work" for purposes of Exclusion M that encompassed professional services could be viewed as inconsistent with the heading under which that language appears, and thus, perhaps susceptible to more than one reasonable interpretation. Heirloom and CFI do not make any argument that Exclusion M is ambiguous, however (see generally ECF Nos. 77, 84, 97, 105, 114; see ECF No. 113 at 8-11), and particularly not because the "Faulty Workmanship" heading creates a conflict with the language thereunder. Therefore, the Court does not further address this.

The Court acknowledges that there may be some professional services performed on property. Those services are not before the Court, however. In any event, merely because there may be some duplication between various exclusions in the CGL policy does not render the professional services exclusion meaningless as to those services that are not duplicated.

As the treatise CFI and Heirloom cite states, a party purchasing design-build professional liability coverage "should carefully compare the various available policies, and should attempt to negotiate terms and conditions that will maximize the protection provided by these policies." Cushman & Loulakis, supra , at § 8.09[A]. This is because "precise exclusions and other terms and conditions differ from policy to policy, and can be subject to negotiation." Id. Here, it appears that very little care was taken in reviewing the professional liability policy.

In other words, the Court by-passes whether Rockhill waived the defense or should be granted summary judgment based upon it. That being said, the Court notes that the Colorado case Rockhill cites to support its contention that it has not waived reliance upon Exclusion P does not provide support. Rockhill cites Ouedraogo v. Downtown Denver Bus. Improvement Dist. , 2014 WL 559962 (D. Colo. Feb. 13, 2014), for the proposition that the failure to plead an affirmative defense is not fatal where the opposing party had knowledge before trial. (ECF No. 110 at 13.) Rockhill's quotation from Ouedraogo is inaccurate. What the court in that case actually said was that the failure to plead affirmative defenses "according to their precise terms of art is not fatal where the opposing party had knowledge of the defense before trial." Ouedraogo , 2014 WL 559962, at *4 (emphasis added). As Rockhill should know more than well enough, the issue here is not over whether Rockhill failed to plead Exclusion P according to its precise terms of art. Rockhill failed to mention Exclusion P at all as an affirmative defense. In pleading some exclusions and ignoring others, Rockhill knew precisely what it was doing. Moreover, even if the Court was willing to accept Rockhill's suggestion that CFI was aware of Exclusion P as an affirmative defense before trial, Rockhill makes no similar suggestion with respect to Heirloom. (See ECF No. 110 at 13-14.)

The Court notes that the only express warranty in CFI's contract with Heirloom appears to be the following: CFI "warrants the equipment and workmanship on all work completed and all equipment and systems installed for one (1) year following completion of all work." (ECF No. 78-3 at 6.) As discussed, Rockhill fails to explain how this warranty, or any implied warranty, formed the basis of the damages awarded to Heirloom.

MarkWest is illuminating in that it stated that a bad faith claim must fail if "coverage was properly denied and the plaintiff's only claimed damages flowed from the denial of coverage. " MarkWest , 558 F.3d at 1193 (emphasis added). Here, as CFI has explained, its claimed damages do not just flow from the duty to indemnify, but also, allegedly, from, inter alia , the duty to settle. (See ECF No. 97 at 20.)

Rockhill also cites Edge Construction, LLC v. Owners Ins. Co. , 2015 WL 4035567, at *6 (D. Colo. June 29, 2015), but does not provide any parenthetical explanation of that case (see ECF No. 80 at 18), and, after its own review of the same, the Court cannot discern any relevance of that case to the one here.

CFI also argues that it was forced to expend "significant resources" in defending against Rockhill's attempt to recoup defense costs. (ECF No. 97 at 20.) CFI cites factual statement 42 to support this contention, but that statement provides no support for the suggestion that CFI expended significant resources. Instead, it merely describes CFI's counterclaim, a letter CFI sent to Rockhill asking for the recoupment claim to be dropped, Rockhill's initial refusal, and then subsequent decision to do so. (See ECF No. 101 at ¶ 42.)

In its motion for summary judgment, Rockhill requests attorney fees and costs due to CFI bringing frivolous "loss of business income" claims. (ECF No. 80 at 21.) The Court DENIES this request. Although CFI's claims now lack any evidence to support the causation element of a bad faith claim, the Court does not find that the bad faith claims had no "rational" basis, and Rockhill does not make an adequate explanation of why the Court should find otherwise. (See id. )

Although, the Court notes that the motion to strike defendants' jury demand would never have been granted had the Court found that factual disputes existed following summary judgment. Like any other case, those disputes would have gone to a jury to resolve. See Morris , 192 P.3d at 524 ("When conflicting evidence exists, what constitutes reasonableness under the circumstances is ordinarily a question of fact for the jury.").

In its response to the motion to strike defendants' jury demand, CFI requests attorney fees and costs for having to respond to a frivolous motion. (ECF No. 127 at 1, 17.) Although the Court might have been persuaded to consider such a request, CFI provides no explanation or legal basis for awarding attorney fees and costs, and thus, the Court declines to further address the issue.

Because the Court has not granted the motion to compel production, the Court also denies CFI's request for attorney fees and costs with respect to filing the same. See Fed.R.Civ.P. 37(a)(5)(B).